## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

DAVID SMITH,                                  )
        Plaintiff,                       )
                              )     Case No.:
      vs.                                  )
                              )
BROWN UNIVERSITY,                        )
        Defendant.                      )
_____)

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF DAVID SMITH'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF

Plaintiff David Smith ("David Smith" or "David"[1]) requests a temporary restraining order and preliminary injunction against Defendant Brown University ("Brown") on the basis that Brown's heavy-handed and unjustifiable suspension of him in response to a female student's unproven accusations of sexual misconduct violates his contractual rights under Brown's own student policies. After receiving a formal complaint of sexual misconduct, Brown is obligated to: (1) afford the accused student with a presumption of innocence throughout the disciplinary proceedings; (2) conduct a reasonable threat assessment inquiry to determine whether interim measures to protect student safety are necessary; and (3) if so, impose the least burdensome restrictions on the respondent as are necessary to ensure the safety of the complainant and the campus community. Brown did none of those things. Instead, Brown adopted an irrational commitment to David's removal from campus, despite significant inconsistencies within the formal complaint, objective proof that belies certain claims in the complaint, and an utter lack of evidence to support the notion that David is a threat. Brown's decision-makers did not interview a

_____

[1]   Plaintiff filed with his Verified Complaint a motion for leave to proceed in this action using pseudonyms. The names David Smith, Jane Roe, and James Doe are pseudonyms.

single person and, because David had no prior disciplinary history at Brown (or anywhere else), Brown had no information but the short complaint itself to consider when it first decided to immediately ban David from campus and suspend him for the Spring 2022 semester. And when David challenged this decision with evidence refuting those allegations, Brown refused to consider it.

Specifically, as part of his appeal of Brown's emergency interim suspension decision, David submitted a detailed factual response denying the allegations of the complaint together with photographs of the complainant—some taken less than 24 hours after the alleged incident—demonstrating that she had none of the injuries alleged in her complaint (including bruises, torn hair, and bleeding ears).[2] David also informed Brown that the complainant had twice sought out his company after the incident, demonstrating she was not afraid to be in his presence. Finally, David asked Brown to consider alternative measures to allow him to remain a student while the underlying allegations were investigated through Brown's disciplinary process. Again, Brown did nothing. Relying exclusively on the unproven and unsupported written allegations, Brown did not entertain any alternative interim measures, and—worst of all—did not even acknowledge (let alone analyze) the evidence David submitted to challenge the complaint and his interim suspension. As a result, David is forced to pursue immediate injunctive relief to prevent the continuation of his unwarranted suspension.

To be clear, David does not seek to stop Brown's ongoing disciplinary investigation, but only to remain a student and continue his invaluable academic and athletic pursuits pending final

---

[2]  Out of respect for all persons involved, Plaintiff has not attached, even under seal, any of these photographs as exhibits to the Verified Complaint. If the Court deems it necessary, Plaintiff can submit these photographs for the Court's review under seal or for *in camera* review. The complainant removed many of these photographs, after posting them to her social media sites, and they therefore no longer appear on those sites. However, the Plaintiff saved screenshots of these photographs, and they dispositively show that she did not suffer any signs of the injuries that she alleged in her complaint.

resolution of the complaint, consistent with the presumption of innocence that Brown's policies afford him. His interim suspension has already caused great harm that threatens to become irreparable unless this Court orders Brown to lift it.

## I.   FACTUAL BACKGROUND

### A.   Introduction

David is a compelling member of the Brown community, excelling in academics, varsity athletics, and campus engagement. ¶ 9.[3] On November 12, 2021, Jane Roe, a female student at Brown, filed a "Formal Complaint" against him with Brown's Title IX Office. ¶ 10. On the exact day she filed that complaint, she was bragging to David's friends that she intended to file a complaint for the express purpose of getting him "kicked out" of Brown. ¶ 64. On November 18, 2021, Jane achieved her stated goal. ¶¶ 11, 76. On November 16, 2021, Brown notified him of the Formal Complaint and, on November 18, 2021, Brown *immediately* kicked him out of the entire university community without so much as a chance to respond to the complaint. ¶¶ 76–79. Brown's basis for doing so—the only permissible basis under its policies—was that David was likely to engage in further misconduct or posed a "significant threat of harm to the health, safety, and welfare of others or the University community." ¶¶ 13, 133. As that finding flies in the face of David's upstanding citizenship at Brown, and is entirely unsupported by evidence, David submitted several appeals to have the interim suspension lifted. ¶¶ 82, 104. Though Brown afforded him temporary relief to complete the current semester remotely, it remained entrenched in its view that he posed a "significant threat" and therefore must be suspended as of January 7, 2022. ¶ 105. That suspension has now gone into effect, barring him from participating in any

---

[3]    All paragraph references herein refer to paragraphs in David Smith's Verified Complaint (ECF No. 1).

Brown academic or athletic events, including starting Spring 2022 courses when they resume on January 26, 2022. ¶ 80.

**B.    The Underlying and Alleged Conduct**

The basis of Jane's Formal Complaint was a sexual encounter with David during the evening of October 29–30, 2021, which is fully described in the Verified Complaint. ¶¶ 15–31. David and Jane met for the first time at a Halloween party at David's shared residence. ¶¶ 15–17. The two consumed some alcoholic drinks, but neither was overly intoxicated. ¶¶ 18–20. As Jane put it, she was "aware of [her] surroundings." ¶ 20. After they started speaking, David expressly asked Jane if she wanted to kiss him, and she affirmatively said yes. ¶ 22. The two engaged in conversation and, eventually, they mutually decided to leave the crowded party and walk up two flights of winding stairs, which were in the middle of the house, to David's third-floor bedroom. ¶¶ 21, 23. Once there, they kissed. ¶ 24. During the course of the night, David and Jane had consensual sexual intercourse with each other three times. ¶ 25.

Throughout the evening, Jane gave clear and unmistakable signs inviting David to commence and continue sexual intercourse with her. While having sex the first time, the condom that he wore broke. ¶ 26. Concerned, he immediately asked her about the risk of pregnancy—she responded and assured him that there was nothing to worry about because she had an intrauterine ("IUD") device to prevent pregnancy. *Id.* He also asked her about venereal diseases, and she responded and assured him that she had none. *Id.* While David walked to his bathroom, disposed of the condom, and went to the bathroom, Jane stayed in bed, naked, awaiting his return. ¶ 27. She did not leave, sit up, or begin to get dressed. When David returned from the bathroom, the two mutually proceeded to have sexual intercourse a second and third time. ¶¶ 27–28. It was while having sex the third time that Jane suggested that they go downstairs together to return to the party;

upon that suggestion, they immediately ceased having intercourse. ¶ 28. David decided to stay in his room, but Jane went to the bathroom, dressed, and went downstairs to the party. ¶¶ 28–29.

Jane's willingness and, in fact, enthusiasm to have sex could not have been more apparent to David. ¶ 30. During each act, she actively encouraged him to proceed—she used "dirty talk" and other unmistakable verbal and physical signs of desire to engage in active sex with him. *Id.* Throughout their encounter, and after, he had absolutely no reason to believe that she was anything other than a willing, desirous participant. ¶ 31.

Approximately two weeks later, on November 12, 2021, Jane filed a Formal Complaint with Brown alleging a wildly different, and wholly unbelievable and untrue, account of her interactions with David on October 29–30, 2021. ¶ 32. Her one-and-one-quarter-page account contained implausible descriptions of that night's events and bizarre shifts between what she acknowledged was consensual conduct and now falsely alleges was nonconsensual conduct. She described her unequivocally consensual words and actions at the party—such as the fact that, when David asked if she wanted to kiss him, she "said yes" because "it would have been awkward to say no." ¶ 33. However, she also described nonconsensual conduct that is impossible to believe— such as the idea that she was somehow physically "dragged" through a thick crowd of partygoers to "a corner" where David "kiss[ed] [her] again." ¶ 34. She also claimed that he "spat in [her] face" in the middle of a crowded party. ¶ 36. Inconceivably, she claimed that she did not "think anything of it," making her claim that someone had just "spat in [the] face" utterly unbelievable. *Id.* And, despite being allegedly "spat" upon and forcefully "dragged" away from her friends through the crowded party, she also unbelievably claimed that David somehow successfully "pulled" her up two flights of winding stairs, past the partygoers, in the middle of the house to his third-floor bedroom. ¶ 37.

When they started kissing in his bedroom, according to Jane, all she told him was "not to leave marks," and she claimed that she voluntarily took off her clothes there, thus again evidencing that her actual words and actions conveyed consent. ¶¶ 38–39. Importantly, her words and actions communicated her preferences to David and indicated her ability to direct David's behavior. ¶ 49.

In the Formal Complaint, Jane claimed that she removed her clothes because she "didn't know how to say no so [she] took them off." ¶ 39. She claimed that she "let him continue" with sex because she "didn't want to say no." ¶ 42. She claimed that it was only at the end of their encounter that "[she] was quiet"—clearly indicating that she had not been quiet up to that point— at which time David noted her changed demeanor. ¶¶ 44–45. In fact, she claimed that there was only one time at which she affirmatively indicated that she wanted to end their encounter—she claimed that she told David, while having sex the third time, that "[she] had to go downstairs," at which point she claimed that he "stood up." ¶ 45. As such, Jane's fantastical complaint contains elements (a) that *align* with David's version of the events, such as her verbal cues of consent, and (b) that *discredit* her own claim of a forced sexual encounter, thus giving rise to substantial reasons for skepticism. All of this was known to Brown at the time it finalized its decision to suspend David on an interim basis.

Moreover, in her Formal Complaint, Jane alleged that it was *after* her encounter with David (which, according to her, was at approximately 12:30 a.m. on October 30, 2021), and *after* she had the opportunity to speak to two of her friends and had left the party, that she came to the "realiz[ation] that [she] had never consented to having sex with [David]." ¶ 48. Of course, that post-incident realization came *after* she admittedly agreed to let David kiss her, told him "not to leave marks" while kissing her, voluntarily took off her clothes, "didn't want to say no" while

having intercourse, and volunteered that she had an IUD to reassure David that they were safe and could continue. ¶ 49.

Going a step further, in her Formal Complaint, Jane leveled wild accusations of sexual assault against David. She claimed that, during sex, he was violent with her to the point that he "pulled [her] hair until chunks of it fell out," left "bruises on [her] collarbone, left cheekbone, right cheekbone, left side of [her] neck, and right butt cheek," and caused her ear piercings to be "loose and bleeding." ¶¶ 41, 47. From a character standpoint, David is incapable of such brutality against anyone, especially a woman. More importantly, from an evidentiary standpoint, the accusations are demonstrably false and outlandish. Between October 30 and November 3, 2021, Jane posted on her social media sites multiple pictures of herself in various Halloween costumes from the night of the party in question and other parties that same weekend. ¶¶ 57–59. She posted one of these pictures in the early afternoon of October 30, 2021, *barely twelve hours* after she claims to have been violently assaulted, and she later posted others that were taken less than 48 hours after the alleged incident. ¶¶ 10, 57–59.

It already strains belief to think that someone who endured the assault that Jane described would post pictures, mere hours later, of herself from the night in question. But what utterly strains credulity is that *none* of the photos that she posted from that weekend show *any sign* that she suffered physical or emotional trauma. ¶ 60. Specifically, the photographs clearly show her face, head, neck, shoulders, hair, and ears, but none of them show injuries whatsoever to those areas such as bruises, torn or pulled out hair, or bruised or bleeding ear piercings. *Id.* In some pictures, she wears multiple earrings, including large earrings, without any sign of bleeding or trauma to her ears. *Id.* Jane apparently realized that her post-incident postings completely discredited her

account, as she deleted them very shortly after David responded to the Formal Complaint by attaching screenshots of those very same postings. ¶ 61.

It is hard to discern Jane Roe's motives for filing such false and contrived accusations against David Smith, but her Formal Complaint indicates one possible motive. David and Jane share a mutual connection—James Doe—who is a friend and teammate of David's and who, unbeknownst to David, had recently slept with Jane. ¶¶ 35, 50. At 9:16 a.m. on October 30, 2021, the morning after the party, David called James and told him that he (David) had been with Jane. ¶ 50. David wanted Jane's phone number. *Id.* James became very angry upon learning that David and Jane had been together, and he refused to give David her phone number. ¶ 51. David called James back at 9:22 a.m., but James would not answer. *Id.* While that was happening, James texted Jane, at 9:22 a.m., asking, "Why did you get with my teammate?" ¶ 52. At 12:25 p.m. on October 30, 2021, Jane responded, "you don't know anything," "i didn't fucking want it." *Id.*[4]

By all indications, it was Jane Roe's embarrassment, feelings of regret, along with James Doe's angry text message, that led Jane to retaliate against David Smith by filing the Formal Complaint. In the Formal Complaint, Jane claimed that the text from James "put [her] under the impression that [David] purposefully sought [her] out to have sex with [David] because [David] knew about [her] history with [James]." ¶ 53. She claimed that, "[e]ven if that wasn't true, [David] clearly bragged about having sex with me to [James]." *Id.* As Jane believed that David had shared intimate details regarding her and David's sexual activities with James, with whom she had previously had sex and for whom she quite possibly had feelings, she felt betrayed by David,

---

[4]   Within minutes of that 12:25 p.m. text, Jane Roe posted a smiling picture of herself from the night in question to a social media site, suggesting nothing but a fun and social celebration of Halloween had occurred. ¶ 58.

sought to appease James who was clearly angry, and decided to file the Formal Complaint. ¶¶ 54–55.

In the days that would follow, Jane Roe openly bragged about her intent to get David Smith "kicked out" of Brown, and she willingly initiated contact with him twice. On Friday, November 12, 2021, David Smith and his housemates held a small last-minute social gathering at their house. ¶ 63. Few people knew about the gathering, but Jane Roe showed up, likely uninvited. *Id.* She stayed there several hours, spoke to David and many of David's friends and openly told his friends of her threat to file a complaint to get David "kicked out" of Brown. ¶ 64. She had already put her plan into place by filing the Formal Complaint also on November 12, 2021. ¶ 63. Jane and David saw each other the next day, November 13, 2021, in a Brown library. ¶ 65. She did not mention the complaint to him. *Id.* The next day, November 14, 2021, Jane texted David asking if they could talk in person. ¶ 66. David agreed but only if they met in a public place, given her threats from Friday at his house. *Id.* They met and spoke on the college green. ¶ 67. In none of these interactions or conversations did Jane indicate that she felt "threatened" by David—her actions indicated the exact opposite, as she affirmatively sought him out and even threatened him in his home, the site of the alleged incident. *Id.*

### C.    Brown's Emergency Removal Procedures and Unsupportable Threat Assessment

Six days after Jane Roe filed her Formal Complaint, Brown summarily suspended David Smith on November 18, 2021. ¶ 78. Because David was suspended, he could not attend classes or hand in assignments. ¶ 79. In fact, the day he received the suspension notification, he was about to enter a classroom for a quiz; he immediately turned around and did not take that quiz. *Id.* On November 23, 2021, the interim suspension was modified to allow him to take classes remotely and, in one instance, he was allowed to take one exam on campus. ¶ 84. However, the interim

suspension was reactivated in full force on January 7, 2022. ¶ 105. As of that date, David is again suspended and unable to participate in any Brown activities, including attending practices and training for his varsity sports team and attending Spring 2022 classes, which are scheduled to start on January 26, 2022. ¶ 80.

Under its own policies, Brown may suspend students on an interim basis only after convening a "Threat Assessment Team" that must determine whether there is "**reasonable cause to believe**" that the respondent poses a "significant threat" to either the respondent or the University community:

> **Emergency Removal:** Emergency removal is the process where the institution places a Respondent on an interim suspension, interim leave of absence, and/or interim removal from campus. The Title IX Program Officer will bring reports that may necessitate an emergency removal to the Threat Assessment Team in the case involving Student Respondents, or convene a risk assessment group for cases involving Employee Respondents to determine whether there is reasonable cause to believe that the Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community.
>
> If the Threat Assessment Team determines that an emergency removal of a student is warranted, it will recommend that action to the Associate Vice President for Campus Life and Dean of Students who will decide whether to implement the emergency removal. Emergency removals of a student can be appealed to the Vice President of Campus Life. Brown may remove a student on an emergency basis with or without the completion of a complaint resolution process.

*See* Gender-based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Policy (hereafter, "Title IX Policy") § 4.0; Sexual and Gender-Based Misconduct Policy (hereafter, "Non-

Title IX Policy") § 4.0.[5] ¶ 133, Exs. A & C. While Brown did not do so here, Brown's policies also permit Brown to take less severe interim actions to protect a complainant without unreasonably burdening the respondent's access to education, including imposing restrictions on campus access or shifting to remote course access:

> **Interim Action:** A course of action taken by the University in response to a report of Prohibited Conduct. These measures may be both restorative (designed to address a Complainant's safety and well-being and continued access to educational opportunities) and remedial (involving action against a Respondent without unreasonably burdening a Respondent.) Interim actions may include housing relocation, on-campus housing restriction, change in work location or modification of work hours, restricted access to certain buildings or locations of campus, course reassignment or shift to remote course access . . . .

Title IX Policy § 4.0; Non-Title IX Policy § 4.0. ¶ 133, Exs. A & C.

As set forth in more detail below and in David's Verified Complaint, Brown suspended David based only on a bare assessment of the complaint, and Brown has demonstrated that its decision to suspend David was based solely on that complaint during the appeal process. Originally, in the first instance the Threat Assessment Team had in its possession *only* Jane Roe's one-and-a-quarter-page complaint, and then after an unsuccessful appeal of that decision,

---

[5]   As noted in the Verified Complaint, Brown maintains *separate* sets of policies and procedures designed to skirt federal regulatory requirements whenever Brown can justify eschewing compliance with Title IX: (A) the "Gender-based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Policy" (hereafter, "Title IX Policy") and the "Title IX Grievance Procedure" (hereafter, "Title IX Procedure"); and (B) the "Sexual and Gender-Based Misconduct Policy" (hereafter, "Non-Title IX Policy") and the "Sexual and Gender-Based Misconduct Complaint Procedure" (hereafter, "Non-Title IX Procedure"). ¶¶ 69, 121, Exs. A, B, C & D. David Smith contends that the Formal Complaint should be adjudicated under the Title IX Policy and Title IX Procedure, whereas Brown asserts that the Non-Title IX Policy and Non-Title IX Procedure control the Formal Complaint. ¶¶ 127–128.

That dispute is not relevant to this motion, however, since David's contractual rights are the same under *either* set of policies and procedures, as they contain identical provisions regarding a presumption of innocence, proper "Interim Actions," and proper "Emergency Removals." Herein, David cites both sets of policies and procedures, and does not waive any argument regarding which set of policies and procedures should be applied to the resolution of the Formal Complaint.

determined that this was sufficient information to remove David from campus on an emergency basis and to suspend him for the Spring 2022 semester. ¶¶ 77, 95–103. After David unsuccessfully appealed that decision to Brown Vice President Eric Estes, the Threat Assessment Team reconvened after David filed his Response to the Formal Complaint, ostensibly to consider the new information he provided, which included photographs showing that Jane had no injuries (contradicting the allegations in her complaint) and that Jane had twice sought out David's company *after* the alleged incident of sexual assault. ¶ 87. However, David obtained the Threat Assessment Team's notes through a FERPA request, and there is absolutely no indication whatsoever that the team considered the additional evidence David supplied.[6] ¶ 98. Rather, the team appears to have rubber-stamped its initial determination because its notes are devoid of any discussion or analysis of David's response or evidence. ¶ 99. David again appealed this subsequent Threat Assessment, which Vice President Estes again denied without explanation. ¶¶ 104–105.

Brown has been unrelenting in its rushed decision to suspend him, even when presented with overwhelming evidence that contradicts the Formal Complaint. ¶¶ 104–105. Moreover, Brown has possession of evidence demonstrating that its "Threat Assessment Team"—which is procedurally tasked "to determine whether there is **reasonable cause** to believe" that prohibited conduct will continue or that he "poses a **significant threat** of harm to the health, safety, and welfare of others or the University community"—committed grave errors in its assessment. ¶¶ 95–102. In his December 20, 2021, appeal to Vice President Estes, David pointed out the myriad

---

[6]   The Family Educational Rights and Privacy Act (FERPA) requires educational institutions to provide students with access to their education records upon request. *See* 34 C.F.R. § 99.10. Brown responded to this request by allowing David to review, but not retain, a copy of the Threat Assessment Team's records. As a result, David is unable to supply the Threat Assessment Team records to the Court and his allegations are based on the notes he took during his review.

failings of the Threat Team Assessment. ¶ 104. As discussed in greater detail below, the Threat Assessment Team: relied on nothing more than Jane Roe's one-and-one-quarter-page, unsupported Formal Complaint itself; did not cite evidence corroborating her account or of her alleged injuries; ignored substantial evidence that discredited the account in the Formal Complaint and the alleged injuries; noted that David had never been accused of, found responsible for, or even been associated with any prior conduct that suggested he might be a safety risk to anyone; and then, significantly, relied on a report that contained numerous misstatements of fact, even misstating facts from the Formal Complaint. ¶¶ 95–102.

Also significant is the fact that Brown has never attempted to explain how the No-Contact Order is an insufficient means of keeping David and Jane from coming into contact for the pendency of the formal resolution process. ¶ 142. Nor has Brown ever considered other measures, less restrictive than an outright suspension, that could be put into place to control David's whereabouts, such as class scheduling restrictions (ensuring they are not in the same building at the same time) or campus curfews. *Id.* David has complied with the No-Contact Order (whereas Jane has willingly come into contact with him since she filed the complaint, ¶¶ 76, 98) and would willingly comply with other reasonable restrictions on his location on campus.

Throughout this ordeal, David has attempted to advise Brown of its grave mistakes and give it the opportunity to reverse its unjustifiable decision to suspend him pending the resolution of the Formal Complaint. Brown refuses, thus necessitating this action before this Court.

## II.   ARGUMENT

Federal Rule of Civil Procedure 65 allows a court to grant a temporary restraining order when a plaintiff demonstrates, through specific facts in an affidavit or a verified complaint, that they will suffer "immediate and irreparable injury, loss, or damage." Fed. R. Civ. P. 65(b)(1).

Identical standards apply to temporary restraining orders and preliminary injunctions. *Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I. 2016). For either, the "court [1] must gauge the movant's likelihood of success on the merits; [2] must evaluate whether and to what extent the movant will suffer irreparable harm if injunctive relief is withheld; [3] must calibrate the balance of hardships as between the parties; and [4] must consider the effect, if any, that the issuance of an injunction (or the withholding of one) will have on the public interest." *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 158 (1st Cir. 2021).

The First Circuit has noted that "the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting 11A Wright & Miller § 2948.1, at 139). Where irreparable harm would otherwise result, a preliminary injunction is a powerful tool to "preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).

David's case, as supported by the Verified Complaint and exhibits, satisfies all prerequisites for a temporary restraining order and preliminary injunction. As courts across the country have recognized in cases of similarly situated respondents in campus sexual misconduct proceedings, David's case cries out for immediate injunctive relief.

## A.    David Is Likely to Succeed on His Breach-of-Contract Claim

The likelihood-of-success factor does not require a plaintiff to make an irrebuttable showing that they will ultimately succeed on the merits. Rather, a court can find a likelihood of success without having to "predict the eventual outcome on the merits with absolute assurance."

*Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). A party "need not *prove* its claims at the preliminary injunction stage, only that it is *likely* to be able to prove its claims later." *Kleczek on Behalf of Kleczek v. R.I. Interscholastic League, Inc.*, 768 F. Supp. 951, 953 (D.R.I. 1991) (emphasis in original). David Smith satisfies this low bar and presents a strong showing that Brown breached its contract with him by imposing the interim suspension.

### 1.   A contract exists between Brown and David

The elements of breach of contract are the existence of a contract, breach of that contract, and damages flowing from the breach. *See Petrarca v. Fidelity and Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005). Courts, including those in Rhode Island, recognize that the relationship between student and university is contractual in nature. *See Gorman v. St. Raphael Academy*, 853 A.2d 28, 34 (R.I. 2004); *Mangla v. Brown University*, 135 F.3d 80, 83 (1st Cir. 1998). "The terms of the contract may include statements provided in student manuals and registration materials." *Id.* The proper standard for interpreting those terms is that of "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Id.* (internal quotation marks omitted). "A breach of contract is established if the facts show that the university has failed to meet [the student's] reasonable expectations." *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61–62 (1st Cir. 2016) (internal quotation marks omitted).

A contract exists between Brown and David. Brown offered David enrollment in the winter of 2018, and David accepted that offer by paying tuition and enrolling in the Class of 2023. ¶ 8. As part of his enrollment, Brown required David to comply with its student handbook and all student policies and procedures, including its Title IX Policy and Title IX Procedure (collectively, the "Policies and Procedures"). ¶¶ 124, 131, Exs. C & D. The Policies and Procedures provide the terms of Brown's contractual relationship with David. ¶ 132.

2. *Brown breached its contract with David in multiple ways*

The Policies and Procedures promised David a "procedure . . . grounded in fairness and support for all parties." Title IX Procedure § 1.0, Non-Title IX Procedure § 1.0. However, Brown's actions have been anything but fair or supportive to David, and Brown violated David's reasonable expectations as a student subject to those Policies and Procedures in several ways.

*First*, although David was promised a "presume[ption] that [he] is not responsible for the alleged Prohibited conduct until a determination is made at the conclusion of this procedure," Brown has treated David as guilty at every step. Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0. Rather than presuming him not responsible, Brown immediately removed him from campus and suspended him before performing any investigation into Jane's allegations. ¶¶ 78, 135. Brown took these actions two days after it informed David of the Formal Complaint without giving him so much as an opportunity to respond. *Id.* Rather than treating David with "fairness" and presuming that he was "not responsible" until proven otherwise, Brown applied a diametrically opposite presumption, presuming that he was responsible based solely on Jane's bare allegations and despite the substantial evidence David later submitted disproving those allegations. ¶ 136.

Further, the Threat Assessment Team's finding that he posed a "significant threat" to campus safety runs afoul of the contractual presumption that David is not responsible, given that it had *zero* evidence showing that he posed a threat to anyone and that it possessed evidence showing the *exact opposite*, *i.e.*, that he had a history as an upstanding campus citizen. ¶ 96. These actions violated David's reasonable expectation that he would be presumed "not responsible" until proven otherwise. *See Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 193 (D.R.I. 2016) (". . . Brown's decision to ban [plaintiff] from campus prior to conducting an investigation states a plausible claim

-16-

for a breach of the rights outlined in the Code to be assumed not responsible until proven otherwise. . . .").

*Second*, Brown was contractually restricted from imposing any "Interim Action" against David unless it ensured that such measures were "both restorative (designed to address a Complainant's safety and well-being and continued access to educational opportunities) and remedial (involving action against a Respondent without unreasonably burdening a Respondent.)." Title IX Policy § 4.0; Non-Title IX Policy § 4.0. Brown breached this provision because the interim suspension, an Interim Action, is not "restorative" and "remedial" as those terms are defined. ¶¶ 133, 137. The interim suspension is absolutely unnecessary to ensure Jane's safety, well-being, and continued access to educational opportunities—David and Jane had never met prior to the alleged incident, do not attend the same classes, and do not come into unavoidable contact. ¶ 138. Brown's own Threat Assessment Team cited no evidence to the contrary. ¶ 101. Moreover, Brown entirely failed to consider whether the existing No-Contact Order sufficiently meets the aims of an Interim Action. In doing so, Brown failed to take measures that were "remedial," given that they are entirely unnecessary and, moreover, are substantially and unreasonably burdensome to David. ¶ 139. The interim suspension is unreasonably burdensome to the extreme, given that it bans David from campus, prevents his ability to start the Spring 2022 semester, blocks his ability to participate in his varsity sport in Spring 2022, and will likely cause him to be unable to graduate on time. ¶ 12. It will also likely cost him a job opportunity this summer. ¶ 143. Being subject to an unreasonable and improper Interim Action violated David's reasonable expectations under the Policies and Procedures.

*Third*, Brown's contract prevented it from imposing an "Emergency Removal" unless its Threat Assessment Team first identified "**reasonable cause** to believe" that prohibited conduct

would continue or that David "poses a significant threat of harm to the health, safety, and welfare of others or the University community," Title IX Policy § 4.0; Non-Title IX Policy § 4.0. Brown violated that contract because its Threat Assessment Team failed to conduct a reasonable and even-handed investigation to determine whether "reasonable cause" existed. ¶ 140. *See Brown Univ.*, 166 F. Supp. 3d at 193 (". . . Brown's decision to ban [plaintiff] from campus prior to conducting an investigation states a plausible claim for a breach of the rights outlined in the Code. . . ."). Furthermore, Brown violated its contractual obligations because it imposed an interim suspension on David without any "reasonable cause" to believe that the conduct alleged would continue or that he posed a "significant threat" to anyone. ¶ 141.[7]

The Threat Assessment Team's records revealed that the *only evidence* the Threat Assessment Team had was Jane Roe's one-and-one-quarter-page Formal Complaint itself—the Threat Assessment Team did not attempt to corroborate her unproven accusations and the records do not reflect any independent evidence showing that David posed a threat to her or others. ¶¶ 95– 99. The records contained no information, prior history, or evidence indicating that David was likely to engage in sexual misconduct or that he posed a threat, much less a "significant" threat, to anyone. *Id.* In fact, the records expressly noted the fact that David had never been accused of, found responsible for, or even been associated with any prior conduct that suggests he poses a continuing safety risk. ¶ 96. The Threat Assessment Team acknowledged that there was no historical pattern of disciplinary problems or threats, no evidence of violence, no evidence of weapons, and no evidence of anything other than the Formal Complaint itself. *Id.*

---

[7]   David Smith's Verified Complaint alleges that Brown's fundamentally unreasonable conduct is a result of its decision to bow to *extreme* external pressures to combat sexual assault on campus, including ongoing class action litigation, campus protests and activism, media scrutiny, and social media campaigns organized by students and alumni. ¶¶ 107–114. In other words, Brown's decision in this case is not based on the facts before it, but rather on a concerted effort to appease a campus community that is, rightly or wrongly, extremely dissatisfied with Brown's efforts to combat campus sexual assault.

Most distressingly, the Threat Assessment Team records revealed that the team responsible for determining whether David was a "significant threat" actively ignored substantial evidence available to it that discredited the Formal Complaint and demonstrated that David was not a threat to anyone, especially Jane. ¶ 98. Specifically, the Threat Assessment Team ignored: (1) photographic evidence that Jane was engaging in an active and healthy social life immediately following the alleged incident; (2) photographic evidence that Jane suffered no injuries as a result of the alleged incident, contradicting her claims that she suffered extensive and severe injuries from the alleged incident; and (3) evidence that Jane affirmatively sought out David following the incident (herself violating potential no-contact restrictions), including by attending a subsequent gathering at his residence, messaging him to speak to him again, and arranging to meet with him in person. *Id.* This evidence shows unmistakably that Jane's health and safety were never threatened by David; yet, the Threat Assessment Team's analysis was silent on this evidence. *Id.* David had a reasonable expectation that Brown would at least consider the evidence he presented in opposition to his emergency removal and interim suspension. While courts may be hesitant to second-guess a university's decision after a considered analysis of the evidence, that is not what happened here. No deference to Brown's decision is required where the record establishes that Brown refused to even acknowledge the evidence contradicting both the allegations of Jane's complaint and the existence of any threat of future harm to Jane or the campus. Brown's threat assessment was arbitrary and biased.

Moreover, the Threat Assessment Team's records revealed that the team relied on several factual mistakes to support its conclusion. ¶ 101. The team noted that David and Jane see each other "frequently"; however, it cited no evidence of that. *Id.* That contention is untrue and has never been true. *Id.* Jane's Formal Complaint notes that she met David for the first time on the

night of the alleged incident, and she and David do not share majors or classes. *Id.* The existing No-Contact Order is more than adequate to ensure their continued separation during the pendency the resolution proceeding. Additionally, the Threat Assessment Team noted that Jane was under "excessive" alcohol or drugs the night of the alleged incident. ¶ 102. But it cited no facts to support that, and it is directly contradicted by Jane's own Formal Complaint, in which she stated that she was "aware of [her] surroundings." *Id.* The Threat Assessment Team also failed to take into account the contemporaneous, and highly credible, report of officers from Brown's Department of Public Safety ("Brown University Police") who, within an hour of when Jane alleged that she was sexually assaulted, responded to a neighbor's noise complaint at the residence and noted that David was "extremely cooperative and understanding" in responding to the noise situation. ¶ 19. The Threat Assessment Team did not note this evidence showing that David was clearly not intoxicated.

Brown violated David's reasonable expectations under the Policies and Procedures by subjecting him to an interim suspension without first exercising any care or diligence in assessing or investigating the credibility of the complaint, taking such action without "reasonable cause" to believe he constituted a threat to anyone, and by relying on multiple misstatements of fact to justify its decision. Even under the most deferential standard of review possible, Brown's conduct in blatantly ignoring contrary evidence cannot satisfy its obligation to conduct a reasonable inquiry. This behavior, coupled with its abject failure to minimize the disruption to David's education and to honor his absolute right to a presumption of innocence, constitutes a clear breach of contract.

>3.   *David suffers and will continue to suffer substantial damages flowing from Brown's breaches*

Brown's unjustified breaches have caused and will continue to cause David substantial damages. As discussed in greater detail below, David faces irreparable harm from Brown's

breaches if the interim suspension is not lifted by this Court. He already missed one quiz as a result of his suspension, and he missed several weeks of his extracurricular activities and his athletic practices. ¶ 79. A 3.93 GPA student, he faces being prohibited from attending classes when classes resume on January 26, 2022. ¶¶ 9, 12. He will be unable to attend classes, receive educational instruction, and to complete or turn in assignments during his suspension. *Id.* And because the formal complaint resolution process will take several months to complete, he would be unable to enroll in or complete any Spring courses even if he is found not responsible. ¶¶ 80–81. Moreover, he will no longer be able to participate as a member of one of Brown's varsity sports teams this Spring semester. ¶ 81. David is a leader on his team and at the peak of his athletic career. ¶¶ 8, 12. If denied crucial time practicing with his teammates and preparing for the upcoming season, he can never recoup that lost playing time and athletic development.

4.   *Brown's actions also constitute breach of the implied duty of good faith and fair dealing*

Rhode Island law recognizes that "contracts contain an implied duty of good faith and fair dealing." *Mangla*, 135 F.3d at 84. "The implication of the duty is that the parties will act in a manner consistent with the purposes of the contract." *Havlik v. Johnson & Wales Univ.*, 490 F.Supp.2d 250, 261 (D.R.I. 2007). The purpose of Brown's contract with David was to ensure a "procedure . . . grounded in fairness and support for all parties." Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0. For the reasons discussed, Brown violated that contractual "fairness" requirement and, along with it, the implied duties of good faith and fair dealing. *See Brown Univ.*, 166 F. Supp. 3d at 196 ("Because Doe's Complaint states a plausible claim for breach of contract . . . the Court finds that he similarly states a claim that this conduct violated the covenant of good faith and fair dealing inherent in that contract.")

In sum, there is a high likelihood that David will succeed on his breach-of-contract claim regarding his interim suspension.

### B.    David Will Suffer Irreparable Harm Without Judicial Intervention

Monetary damages will not adequately compensate David for the harm he is guaranteed to suffer if this Court does not grant injunctive relief.[8] Rather, this Court must consider the multiple intangible and reputational harms that Brown's conduct unjustifiably imposes on David. The First Circuit measures irreparable harm on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," such that "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010) (internal quotation marks omitted). Here, when coupled with the strong showing on the merits, the irreparable harms that David will suffer, and which will become permanent without a preliminary injunction, entitle him to immediate injunctive relief. Such relief is necessary preserve the status quo and permit this Court to issue an effective remedy upon full adjudication of this case. *See CMM Cable Rep., Inc.*, 48 F.3d at 620.

### 1.    *David will lose irreplaceable educational and academic opportunities*

Brown's unjustifiable actions cut short David's ability to continue his trajectory as an exemplary Brown student. This harm is not imaginary, as his suspension already resulted in him missing in-person classes, group study sessions, and one quiz that he was not allowed to make up. ¶ 79. His education will only continue to suffer if he is not permitted to resume classes with his

---

[8]    The fact that David seeks monetary relief in conjunction with injunctive relief does not mean that monetary relief alone is adequate. *See Doe v. Rensselaer Polytechnic Inst.*, No. 1:20-CV-1185, 2020 WL 6118492, at *13 (N.D.N.Y. Oct. 16, 2020) ("A harm is not irreparable only where damages are unavailable; a harm is irreparable because damages cannot adequately capture the value of the thing the plaintiff has lost.").

fellow students on January 26, 2021. ¶¶ 80, 145. At stake is David's very ability to pursue his education and timely complete and obtain a Brown undergraduate degree. ¶ 145. If the interim suspension is not lifted, he would in all likelihood have to take a "gap" semester, even if he is vindicated in the formal resolution process, as it would be too late into the semester to successfully enroll in and complete Spring 2022 courses. ¶ 81. His academic transcript would forever be marred by that gap, which he would have to explain to every university (*e.g.*, in transfer or graduate school applications) and prospective employer. *Id.* Countless courts have determined that is exactly the type of irreparable harm to a college student's academic and professional career that a preliminary injunction is intended to prevent.[9]

> 2.    *David will lose irreplaceable athletic opportunities, from which he could never recover*

Brown's unjustifiable actions have stripped David of his ability to participate and compete in collegiate athletics. David is an extraordinarily accomplished member of a Brown varsity sports team. ¶ 9. He is an extremely accomplished athlete who is now at the pinnacle of his athletic career. *Id.* Courts have routinely found that loss of the opportunity to play collegiate sports on a continuous and uninterrupted basis, risking loss of continued training and athletic development, constitute

---

[9]    *See, e.g.*, *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 1179955, at *9 (S.D. Ohio Mar. 13, 2015) (finding that suspension caused irreparable harm because it "effectively denied [plaintiff] the benefit of the work already performed in the classes this semester and delayed the completion of his degree," and plaintiff would "forever have this disciplinary action on his academic record, which may impact his ability to enroll at another institution, or affect his future career possibilities"); *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) (finding that suspension caused irreparable harm because plaintiff "will forever have either a gap or a senior-year transfer on his record," which would inevitably lead to questions "by future employers or graduate school admissions committees," and that monetary damages were inadequate to erase the "stigma" this would cause); *Byrnes v. Johnson Cty. Cmty. Coll.*, No. CIV.A. 10-2690-EFM, 2011 WL 166715, at *4 (D. Kan. Jan. 19, 2011) (finding that expulsion causing "absence from the nursing school for the Spring 2011 term irreparably harms [plaintiff] by imposing a minimum of a one year delay in her nursing education and therefore her opportunity to earn a living as a registered nurse").

clear irreparable harm.[10] David will suffer such harm if not allowed to resume his athletic training this semester.

          3.      *David will lose a summer job he obtained as well as future employment opportunities*

     Brown's actions jeopardize a job that David secured for summer 2022. ¶ 143. He earned this job after months of preparation, and it promises potential future career opportunities. It is contingent, however, upon him completing his Spring 2022 semester with adequate grades and ultimately being on course to graduate at the end of the Spring 2023 semester. Neither will happen if he is not allowed to resume classes by January 26, 2022. Moreover, as noted, he will have to explain to every future employer why there is a gap on his transcript related to his absence from Brown caused by the suspension. ¶ 81. The direct loss of a job and potential loss of future job opportunities are clear examples of irreparable harm.[11]

     In sum, David will suffer multiple forms of irreparable harm if his interim suspension is not lifted. This Court would be unable to adequately remedy these damages at the end of this proceeding, since, even if David is found innocent at the end of Brown's formal resolution process, these harms—*i.e.*, the loss of one semester of academics and athletics—would already have become permanent. The extent of these damages, which is extensive, defy monetary quantification.

---

[10]   *See, e.g.*, *Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) (finding that suspension of football player, depriving him of "opportunity to participate in sports on a continuous and uninterrupted basis," constituted irreparable harm); *Ganden v. National Collegiate Athletic Association*, 1996 WL 680000, at *6–7 (N.D. Ill. Nov. 21, 1996) (noting that because collegiate athletes have only a limited span of competitiveness, losing a year of competition would irreparably inhibit their development as athletes).

[11]   *See, e.g.*, *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (finding that plaintiff suffered irreparable harm where he would lose one job offer as a result of his suspension and "would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap").

They are precisely the type of irreparable harms that preliminary injunctions are intended to prevent.

### C.    The Hardship to Brown from a Preliminary Injunction Is Far Outweighed by the Hardship David Will Suffer Without an Award of Injunctive Relief

The irreparable harms that David will suffer far outweigh any hardship to Brown as a result of granting a temporary restraining order and preliminary injunction.[12] To be clear, David does not seek to stop Brown from carrying out the disciplinary process or adjudicating Jane's complaint under the appropriate Policies and Procedures. Rather, he simply seeks the opportunity to return to campus and to continue his promising academic and athletic career at Brown, which he is entitled to do under the presumption that he is "not responsible" until proven otherwise in the formal resolution process.

Brown faces no hardship by merely allowing David to continue his academic and athletic career uninterrupted during the pendency of the formal resolution process. Brown's interests in protecting Jane's and campus safety are adequately served through other means, particularly the No-Contact Order that has been in place since David's suspension. The No-Contact Order will remain in place, and there is no evidence that it is inadequate. ¶ 142. David has complied with it, and Jane has indicated that no protective measures are necessary to make her feel safe, since, after she filed her complaint, she has spent hours in David's home, threatening him in front of his friends, and reached out to David and even initiated an in-person meeting with him (likely in violation of no-contact obligations imposed upon her by the filing of her complaint). ¶ 98. Moreover, David has a good disciplinary record spanning his entire two and a half years at Brown,

---

[12]    *See Middlebury Coll.*, 2015 WL 5488109, at *4 ("The harm Middlebury will suffer if Plaintiff is allowed to remain a student for the fall semester is not as great as the harm Plaintiff will suffer if he is not permitted to return to campus but ultimately prevails in the case."); *DePauw Univ.*, 2014 WL 4197507, at *14 (finding balance of harm firmly in student's favor).

and neither Brown nor its Threat Assessment Team unearthed even a shred of evidence suggesting that he is a threat to campus safety. ¶ 96.

The costs to Brown of allowing David to resume his education are little, whereas the costs to David of disallowing that are great. The balance of hardships favors a temporary injunction and preliminary injunction.

### D.   Granting a Preliminary Injunction Will Serve the Public Interest

The public interest is served by lifting the unjustifiable interim suspension. The public, and the Brown University community in particular, has an interest in seeing Brown's Policies and Procedures "applied fairly to both complainants and respondents in disciplinary actions." *DePauw Univ.*, 2014 WL 4197507, at *14. "[I]t is always in the public's interest that a student be treated fairly before being disciplined." *Ritter v. State of Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016); *see also Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp.3d 533, 588 (E.D. Va. 2016) ("[L]eaving in place a wrongfully imposed sanction and the record of such is plainly contrary to the public interest.").

Here, it is abundantly clear that the public interest is best served by Brown enforcing its Policies and Procedures according to their terms in an evenhanded manner, particularly where there are substantial issues regarding the veracity of the Formal Complaint and a complete lack of evidence that David constitutes a "significant threat" to the complainant or campus community. Granting the temporary restraining order and preliminary injunction will achieve this goal, while also allowing David to continue his academic and athletic career.

### E.   The Circumstances Warrant Expedited Consideration and Issuance of a Temporary Restraining Order

David faces an imminent deadline—January 26, 2022. That is the day that his Spring 2022 classes resume at Brown. ¶ 80. A decision by the Court before that date will give him a fighting

chance to schedule and start classes, and to train with his sports team by that date. Absent expedited relief, he likely will not be able to do either and will likely miss out on his Spring 2022 semester in its entirety. ¶ 81. We respectfully ask the Court to give him that fighting chance.

**III.    CONCLUSION**

For the reasons set forth herein, David Smith respectfully requests that this Court restrain and enjoin Brown from denying him his contractual rights under the Policies and Procedures, from suspending him pending resolution of Jane Roe's complaint, denying him class attendance and participation, and denying him the ability to continue practicing, training, and competing in varsity athletics until such time as he is formally found responsible for the alleged conduct.

Dated:  January 14, 2022

Plaintiff, David Smith,
by and through his attorneys,


/s/ Maria F. Deaton
Maria F. Deaton, Esq. (#7286)
Lynch & Pine, Attorneys at Law
One Park Row, Fifth Floor
Providence, RI 02903
(401) 274-3306
mdeaton@lynchpine.com

and

/s/ Patrick C. Lynch
Patrick C. Lynch, Esq. (#4867)
Lynch & Pine, Attorneys at Law
One Park Row, Fifth Floor
Providence, RI 02903
(401) 274-3306
plynch@lynchpine.com

**CERTIFICATE OF SERVICE**

I, Maria F. Deaton, certify that on January 14, 2022, this document was electronically filed through the Court's CM/ECF system and is available for viewing and downloading to all registered counsel of record.

/s/ Maria F. Deaton
Maria F. Deaton, Esq. (#7286)
Lynch & Pine, Attorneys at Law
One Park Row, Fifth Floor
Providence, RI 02903
(401) 274-3306
mdeaton@lynchpine.com