UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

DAVID SMITH, a pseudonym,

v.                                                C.A. NO.: 22-cv-24-JJM-PAS

BROWN UNIVERSITY

## DEFENDANT BROWN UNIVERSITY'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF

As stated below by Defendant Brown University ("Brown" or the "University"), Plaintiff's emergency motion for injunctive relief fails for two basic reasons (either of which is a sufficient ground to deny his motion):

- <u>First, Plaintiff has not shown a likelihood of success on the merits:</u>

There is no breach of contract nor breach of the implied covenant of good faith and fair dealing. Brown applied and followed its policies and procedures in conducting its threat assessment evaluation and, in exercising its institutional authority and professional judgment, concluded that Plaintiff's interim suspension is warranted. It is not the Court's role to pass judgment on whether it agrees with Brown's determination, nor act as a "super appeals court" to review a decision made in the University's internal disciplinary processes. Further, even if the Court were to find some error in Brown's process (which Brown strongly denies), the proper remedy would be a remand to Brown to conduct its threat assessment review in accordance with any instruction from the Court. Respectfully, the University should retain its decision-making authority to assess and address the level of any threat to its campus and community.

- <u>Second, Plaintiff has not shown irreparable harm:</u>

Contrary to Plaintiff's contention, "countless" federal courts have not "routinely" issued injunctions in cases of this nature nor found irreparable harm. Actually, as Brown cites below, a majority of federal courts have found that there is no irreparable harm in a delay in the completion of academic course work or an anticipated graduation date, which can be adequately compensated through a monetary damage claim if the plaintiff ultimately prevails in the litigation.

1

## I.     FACTUAL BACKGROUND[1]

### A.     Brown's Policies and Procedure to Address to Reports of Alleged Sexual Misconduct

Plaintiff "David Smith" is the respondent in an ongoing disciplinary case at Brown to address a formal complaint filed against him on November 12, 2021 by another undergraduate student (referenced in this litigation as "Jane Roe") under Brown's Sexual and Gender-Based Misconduct Policy.  E.E. Decl. ¶ 7; K.B. Decl. ¶ 9.  Jane alleges that, during the early morning hours of October 30, 2021, Plaintiff sexually assaulted her within his off-campus apartment, through his use of violence and force that inflicted physical injuries upon her.  K.B. Decl. ¶ 9; E.E. Decl. ¶ 7.

Brown's Title IX and Gender Equity Office administers two sets of University policies to respond to reports of sexual and gender-based harassment and sexual violence.  Brown has enacted: (1) its Sexual and Gender-Based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Policy (known as the "Title IX Policy") and (2) its Sexual and Gender-Based Misconduct Policy (which addresses misconduct outside Title IX's definitional and jurisdictional scope).  K.B. Decl. ¶5; E.E. Decl. ¶ 5.  This latter policy is what Plaintiff references as the "Non-Title IX Policy," but Brown will refer to it herein by its actual name.  Plaintiff wrongly contends that Brown's Title IX Policy, not its Sexual and Gender-Based Misconduct Policy, applies to his disciplinary case.  Brown explains below why he is wrong and shows that the University is applying the correct policy.[2]

---

[1]   Brown has concurrently filed declarations by Eric Estes ("E.E. Decl.") and Koren Bakkegard ("K.B. Decl.").

[2]   Copies of Brown's Sexual and Gender-Based Misconduct Policy (applicable here) and its Title IX Policy (inapplicable here) are attached as Exhibits A (ECF Doc. 1-3) and C (ECF Doc 1-5) respectively to Plaintiff's Verified Complaint.

Brown's Title IX Policy adheres to the United States Department of Education's 2020 amendments to its Title IX regulations. *See* 34 CFR Part 106; K.B. Decl. ¶ 6. The Department of Education's Title IX regulations and their required grievance process apply to sexual violence and gender-based harassment, as defined by Title IX, within a federal funding recipient's *education program or activity*. It is undisputed that Brown is subject to Title IX and the Title IX regulations.[3]

Consistent with the Title IX regulations' definition of an "education program or activity," Brown's Title IX Policy applies jurisdictionally to the University's response to a report or complaint of alleged sexual misconduct that occurs "on campus or any University controlled location within the United States, or in a University-sponsored program or activity off-campus where the University has control over both the person accused and the context in which the harassment occurred." K.B. Decl. ¶ 6. For example, if the alleged sexual misconduct occurs within a Brown-sanctioned event held off-campus (part of the University's education program or activity as defined by § 106.44(a) of the Title IX regulations), the misconduct would likely fall within the jurisdictional scope of the Title IX regulations and be subject to the University's Title IX Policy.

For reports of alleged sexual misconduct that occurred outside of Brown's education program or activity (thereby outside the jurisdictional scope of the Department of Education's Title IX regulations and Brown's Title IX Policy), Brown's Sexual and Gender-Based Misconduct Policy ensures that the University has a comprehensive response to reports of sexual violence and

---

[3] As defined in the Department of Education's Title IX regulations, a federal funding recipient's "'*education program or activity*' includes locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." 34 CFR § 106.44(a) (italics added).

gender-based harassment.  K.B. Decl. ¶ 7.  The Sexual and Gender-Based Misconduct Policy is a complement to the Title IX Policy, enabling the University to address prohibited sexual misconduct that is alleged to have occurred outside of Brown's education program or activity, which nonetheless has continuing impacts within its community.  K.B. Decl. ¶ 7.

Specifically, the Sexual and Gender-Based Misconduct Policy addresses prohibited conduct occurring at off-campus locations that are not owned nor controlled by the University, when Brown exercises substantial control over both the person harmed and the person accused and the effects of the alleged prohibited off-campus conduct have a continuing discriminatory effect at the University (i.e., an allegation of sexual assault between two students that occurred in an off-campus apartment).  K.B. Decl. ¶ 8.  The alleged sexual assault at issue here occurred at Plaintiff's off-campus residence, which is not within Brown's "education program or activity" and is a third-party owned property that is neither controlled nor owned by the University, but the incident involved two Brown undergraduates and has a continuing impact within the University's community.  Consequently, Brown's Sexual and Gender-Based Misconduct Policy applies to Jane's complaint against Plaintiff.  K.B. Decl. ¶ 10.

To process and resolve complaints subject to the Sexual and Gender-Based Misconduct Policy (such as Jane's complaint against Plaintiff), Brown has published its Sexual and Gender-Based Misconduct Complaint Procedure ("Complaint Procedure").  K.B. Decl. ¶ 11.  The Complaint Procedure applies to Brown's ongoing investigative and resolution processes in Plaintiff's disciplinary case.  Brown is applying the proper policy and procedures.  K.B. Decl. ¶ 11.

As noted above, Plaintiff pleads in his Verified Complaint that his disciplinary case should be subject to Brown's Title IX Policy and its related Title IX Grievance Procedure, instead of the

Sexual and Gender-Based Misconduct Policy and its related Complaint Procedure.[4]  Plaintiff is wrong because his off-campus residence where the alleged sexual assault occurred, which is a premises that he apparently leases from a third-party landlord, is not a location within Brown's "education program or activity," so the Title IX Policy and the Title IX Grievance Procedure do not apply to his disciplinary case.

In addition to his misunderstanding of the definition an "education program or activity," Plaintiff's argument is a total red-herring in this lawsuit, which challenges his interim suspension during the pendency of his disciplinary case.  In their application, Brown's Title IX Grievance Procedure and its Complaint Procedure proceed identically until the case under each reaches the hearing stage.  At the hearing, the Title IX Grievance Procedure allows for a party's advisor to conduct witness cross-examination (consistent with the grievance procedure requirements of 34 CFR §106.45(6)(i) of the Department of Education's Title IX regulations), whereas advisor cross-examination is not part of a hearing held under the Complaint Procedure (where the questioning occurs solely by the hearing panel).  In both matters, students may have an advisor present for the hearings.[5]

---

[4]   Copies of Brown's Complaint Procedure (applicable here) and its Title IX Grievance Procedure (inapplicable here) are attached as Exhibits B (ECF Doc. 1-4) and D (ECF Doc 1-6) respectively to Plaintiff's Verified Complaint.

[5]   Regarding the current status of Plaintiff's disciplinary case, it is in the investigative phase.  The University has retained an experienced external investigator, who has commenced her investigation that will include initial and follow-up interviews of Plaintiff and Jane, the identification and interviewing of witnesses with relevant information, and the compilation of relevant evidence.  The investigator will prepare a draft investigative report for the parties' review and provide them the opportunity to comment before it is finalized.  The investigator considers the parties' comments and may change the content of the report.  When the investigator finishes the report, it is presented to a hearing panel.  The hearing date has not yet been set, and the issue of any right to cross-examination at the hearing is not ripe now and should not be addressed in this litigation, particularly at this early preliminary injunction stage.

**B.     Brown's Policy Provisions on Interim Actions, Including an Emergency Removal of a Student**

Upon Brown's receipt of allegations of sexual misconduct proscribed by the Sexual and

Gender-Based Misconduct Policy (the applicable policy here), the University must determine

whether any interim actions are appropriate and necessary to protect the safety of all parties and

the broader campus community.  K.B. Decl. ¶ 12.  Accordingly, the Sexual and Gender-Based

Misconduct Policy and its Complaint Procedure define an "**Interim Action**" as follows:

> A course of action taken by the University in response to a report of Prohibited
> Conduct.  These measures may be both restorative (designed to address a
> Complainant's safety and well-being and continued access to educational
> opportunities) and remedial (involving action against a Respondent without
> unreasonably burdening a Respondent).  Interim actions may include housing
> relocation, on-campus housing restriction, change in work location or modification
> of work hours, restricted access to certain buildings or locations [on] campus,
> course reassignment or shift to remote course access, interim suspension and/or
> interim removal from campus, or interim administrative leave of absence.  Interim
> action may be taken with or without a formal complaint or the implementation of a
> complaint resolution process and are individualized to protect the safety of all
> parties, the broader campus community, and/or prevent future Prohibited Conduct.

Sexual and Gender-Based Misconduct Policy at Section 4.0 (Definitions) (ECF Doc. 1-3 at p. 15);

Complaint Procedure at Section 3.0 (Definitions) (ECF Doc 1-5 at p. 8); K.B. Decl. ¶ 13.

The Sexual and Gender-Based Misconduct Policy and its Complaint Procedure define an

"**Emergency Removal**" as follows:

> Emergency removal is the process where the institution places a Respondent on
> an interim suspension, interim leave of absence, and/or interim removal from
> campus.  The Title IX Program Officer will bring reports that may necessitate
> an emergency removal to the Threat Assessment Team in the case of Student
> Respondents, or convene a risk assessment group for cases involving Employee
> Respondents to determine whether there is reasonable cause to believe that the
> Prohibited Conduct is likely to continue and/or the Respondent poses a
> significant threat of harm to the health, safety, and welfare of others or the
> University community.
>
> If the Threat Assessment Team determines that an emergency removal is
> warranted, it will recommend that action to the Associate Vice President for

6

Campus Life and Dean of Students who will determine whether to implement the emergency removal.

Emergency Removals of a student can be appealed to the Vice President of Campus Life.  Brown may remove a student on an emergency basis with or without the completion of a complaint resolution process.

Sexual and Gender-Based Misconduct Policy at Section 4.0 (Definitions) (ECF Doc. 1-3 at p. 14); Complaint Procedure at Section 3.0 (Definitions) (ECF Doc 1-5 at pp. 7-8); K.B. Decl. ¶ 14.[6]

Under the above-described process, Brown's Associate Vice President for Campus Life and Dean of Students, Koren Bakkegard, evaluates a recommendation by the University's Threat Assessment Team that an emergency removal of a student is warranted.  K.B. Decl. ¶ 15.  If Associate Vice President Bakkegard agrees with the Threat Assessment Team's recommendation and imposes an emergency removal, a student's appeal of her decision is received by Eric Estes, Brown's Vice President of Campus Life.  K.B. Decl. ¶ 16.

The Threat Assessment Team is comprised of a cross-section of senior University administrators with expertise in diverse issues impacting the University's student community and campus life, who address collectively on a daily basis aspects of academics, campus security, residential life, student safety, health and wellness, and counseling and psychological services. K.B. Decl. ¶ 16.  The Threat Assessment Team applies its Threat Assessment Rubric, which requires the evaluation of multiple factors in the assessment of potential risk to the parties and the broader campus community.  During the Threat Assessment Team's meeting, Associate Vice President Bakkegard participates to facilitate the discussion among the Team members and receive

---

[6]  While not applicable here, the Title IX Policy and Title IX Grievance Procedure similarly allow for a student's emergency removal, applying the same above-stated definition and review process.  *See* Title IX Policy (ECF Doc. 1-5 at pp. 7-8) and Title IX Grievance Procedure (ECF Doc. 1-6 at p. 14).

all viewpoints and recommendations regarding the appropriateness of interim actions.  K.B. Decl.

¶ 16.

### C. Brown's Receipt of Jane's Complaint Against Plaintiff, its Threat Assessment Team's Review, and Associate Vice President Bakkegard's Determination that an Emergency Removal was Warranted

On November 12, 2021, Jane submitted a formal written complaint to Brown's Title IX

and Gender Equity Office.  K.B. Decl. ¶ 17.  Jane reported her allegations that Plaintiff sexually

assaulted her at his off-campus residence during the early morning of October 30, 2021.  K.B.

Decl. ¶ 17.

Jane's complaint raised allegations of Plaintiff 's use of significant violence and force in

restraining and sexually assaulting her.  K.B. Decl. ¶ 18.  As alleged by Jane, Plaintiff allegedly

spit in her face while they interacted during the party and later after he brought her upstairs to his

bedroom.  K.B. Decl. ¶ 18.  While they were alone in his bedroom, Plaintiff allegedly restrained

Jane forcefully, chocked her so hard that she almost passed out, and penetrated her with his penis

three times while engaging in non-consensual intercourse.  K.B. Decl. ¶ 18.  When Jane attempted

to free herself, Plaintiff allegedly told her to perform oral sex on him and tried to push her head

down to his penis.  K.B. Decl. ¶ 18.  Jane alleges that the force and restraint applied by Plaintiff

inflicted bruises upon her.  K.B. Decl. ¶ 18.

Upon the Title IX and Gender Equity Office's receipt of Jane's complaint, Brown's Title

IX Program Officer forwarded the complaint to the Threat Assessment Team for its evaluation

whether there are reasonable grounds to impose interim actions necessary to ensure the safety of

the parties and the broader campus community.  E.E. Decl. ¶ 7; K.B. Decl. ¶ 19.  On November

16, 2021, the Threat Assessment Team convened and reviewed the matter under its Threat

Assessment Rubric, which requires the evaluation of multiple factors in the assessment of potential

risk to the parties and the broader campus community.  K.B. Decl. ¶ 20; E.E. Decl. ¶ 8.  Applying the rubric, the Team considered all of its factors, including Jane's reported injuries, the possibility of further force, violence, and/or danger, the elapsed time since the alleged sexual assault, and concerns about other reported activities that have occurred at the off-campus locations at issue. K.B. Decl. ¶ 21.

The Threat Assessment Team discussed two categories of intervention: measures to mitigate risk to the reporting student and measures to mitigate risk to the health, safety, and welfare of others or the University community.  K.B. Decl. ¶ 22.  The Threat Assessment Team considered the sufficiency of the mutual no-contact orders to be issued to Jane and Plaintiff under the Complaint Procedure, and it concluded that the mutual no-contact orders would aid in the protection to the reporting student and allow for further actions upon notice of any alleged violations of their restrictions.  K.B. Decl. ¶ 23.

The Threat Assessment Team considered the necessity of community-level protections. K.B. Decl. ¶ 24.  Given the egregious nature of the allegations (describing the alleged use of significant force and violence resulting in personal injuries), the Team members concurred that an interim suspension is warranted, because the alleged violent sexual assault poses "a significant threat of harm to the health, safety, and welfare of others or the University community."  K.B. Decl. ¶ 24.

Associate Vice President Bakkegard carefully reviewed the Threat Assessment Team's recommendation that Plaintiff's interim suspension is warranted and weighed the possibility of lesser interim actions.  K.B. Decl. ¶ 25.  Based upon her independent review and assessment, Associate Vice President Bakkegard concluded that the Threat Assessment Team's recommendation was warranted and decided that an immediate interim suspension would be

imposed upon Plaintiff, through the completion of the process under the Complaint Procedure. K.B. Decl. ¶ 25; E.E. Decl. ¶ 8.  Specifically, given the degree of violence and apparent predatory conduct described in Jane's complaint, Associate Vice President Bakkegard concluded that an interim suspension was appropriate to mitigate the risk that any other Brown student would experience similar alleged misconduct.  K.B. Decl. ¶ 25.

On November 18, 2021, Associate Vice President Bakkegard wrote to Plaintiff to inform him of the Threat Assessment Team's recommendation and her decision to implement his interim suspension.  K.B. Decl. ¶ 26; E.E. Decl. ¶ 8.  In accordance with the Emergency Removal provision in the Sexual and Gender-Based Misconduct Policy and its Complaint Procedure, she notified Plaintiff of his right to appeal the interim suspension to Vice President Estes and provided him with the Vice President's email address.  K.B. Decl. ¶ 26; E.E. Decl. ¶ 8.  She also informed Plaintiff that an Associate Dean in Student Support Services was assigned to him as a point person for supporting him, and she also provided him with information about the University's counseling and support resources that are available after business hours on a 24/7 basis.  K.B. Decl. ¶ 26.

**D.    Plaintiff's Response to Jane's Complaint and his Appeal to Vice President Estes**

On November 19 2021, Plaintiff submitted his appeal of the interim suspension to Vice President Estes.  E.E. Decl. ¶ 9; K.B. Decl. ¶ 27.  On November 22, 2021, Vice President Estes met with Plaintiff and his advisor of choice via video conference to discuss the appeal and afford him the fullest opportunity to be heard.  E.E. Decl. ¶ 10.  Vice President Estes determined that, to afford Plaintiff the fullest rights and process, which could allow him to complete his finals, he would adjust the interim measure temporarily by modifying Plaintiff's interim suspension to an emergency interim removal from campus, which would span through the end of Brown's Fall 2021 semester and the January 6, 2022 deadline for the submission of the semester's final grades.  E.E.

Decl. ¶ 11; K.B. Decl. ¶ 28.  Vice President Estes determined that Plaintiff's interim suspension will begin on January 7, 2022 and will remain in effect pending the completion of the process to resolve Jane's complaint against him under the Complaint Procedure.  E.E. Decl. ¶ 11; K.B. Decl. ¶ 28.  Vice President Estes instructed the Threat Assessment Team to reconvene and review Plaintiff's response to Jane's complaint, which Plaintiff submitted on November 23, 2021, and recommend any modifications to the interim measures, if deemed appropriate.  E.E. Decl. ¶ 12; K.B. Decl. ¶ 29.  On November 23, 2021, Vice President Estes informed Plaintiff of his decision to adjust the interim action to an interim removal from campus through January 6, 2022 and an interim suspension taking effect on January 7, 2022.  E.E. Decl. ¶ 11.

> ### E.  The Threat Assessment Team's Further Evaluation and Associate Vice President Bakkegard's Decision Not to Alter the Interim Actions, Including the Interim Suspension Beginning on January 7, 2022

On December 7 and 8, 2021, the Threat Assessment Team reconvened to consider evaluate the additional information provided in Plaintiff's response to Jane's complaint.  K.B. Decl. ¶ 30; E.E. Decl. ¶ 13.  In making its renewed threat assessment evaluation, the Team considered whether there are any reasonable and appropriate grounds to alter the interim actions.  The Team reevaluated its original application of the Threat Assessment Rubric (completed during its November 16, 2021 meeting) and determined that no adjustments were warranted.  K.B. Decl. ¶ 31.

Again, in her authorized role as the senior University officer charged with the responsibility to evaluate and determine whether to accept the Threat Assessment Team's recommendation, Associate Vice President Bakkegard weighed carefully the possibility of lesser interim actions. K.B. Decl. ¶ 32.  Based upon her independent review and assessment, she concluded that the Threat Assessment Team's recommendation was warranted and decided that the interim actions, as

modified by Vice President Estes, should remain in effect pending the completion of the process under the Complaint Procedure.  K.B. Decl. ¶ 32; E.E. Decl. ¶ 13.  Specifically, the information available to Associate Vice President Bakkegard for her review did not change her professional assessment that the interim measures were warranted to mitigate the risk that Plaintiff could commit a violent sexual assault against another Brown student.  K.B. Decl. ¶ 32.

On December 10, 2021, Associate Vice President Bakkegard wrote to Plaintiff to inform him of her determination that his emergency interim removal from campus would remain in effect through the end of the fall semester and submission of final grades on January 6, 2022 and that his interim suspension will begin on January 7, 2022.  K.B. Decl. ¶ 33, 34; E.E. Decl. ¶ 13.  She informed Plaintiff of his right to appeal her decision to Vice President Estes.  K.B. Decl. ¶ 34.  Associate Vice President Bakkegard also addressed Plaintiff's request for permission to take a final examination on campus on December 16, 2021, which she allowed as a limited, one-time exception to enable him to take the examination and complete the course.  She also reiterated to Plaintiff the availability of his assigned support dean.  K.B. Decl. ¶ 36.

###    F.    Plaintiff's Second Appeal to Vice President Estes

On December 20, 2021 (on the eve of the University's December 22, 2021 closing through January 4, 2022 for its holiday recess), Vice President Estes received Plaintiff's appeal of the Associate Vice President's decision that his interim suspension would take effect on January 7, 2022.  E.E. Decl. ¶ 14. To ensure Plaintiff's full opportunity to be heard before the University adjourned for the holiday recess, Vice President Estes responded promptly to Plaintiff and scheduled a video conference to occur during the afternoon of December 22, 2021.  E.E. Decl. ¶ 15.

During the video-conference meeting held on December 22, 2021, Plaintiff was accompanied by his advisor of choice.  E.E. Decl. ¶ 15.  Again, Vice President Estes afforded Plaintiff the opportunity to make any statements or ask any questions.  E.E. Decl. ¶ 15.  Vice President Estes concluded the meeting by stating that he would consider the matter over the University's holiday recess and report his decision to Plaintiff after the University's reopening on January 4, 2022.  E.E. Decl. ¶ 15.

In his careful review of Plaintiff's second appeal and all relevant records, Vice President Estes evaluated the requirements necessary to warrant a student's emergency removal under Brown's Sexual and Gender-Based Misconduct Policy and its Complaint Procedure.  E.E. Decl. ¶ 16.  He concluded that there remains reasonable cause to believe that Plaintiff poses a significant threat of harm to the health, safety, and welfare of others or the University community.  E.E. Decl. ¶ 16.

Consequently, Vice President Estes denied Plaintiff's second appeal.  E.E. Decl. ¶ 16. Plaintiff's interim suspension, which began on January 7, 2022, will remain in effect and continue pending the completion of the University's process to resolve the complaint against him under the Complaint Procedure.  E.E. Decl. ¶ 16.  On January 7, 2022, Vice President Estes informed Plaintiff of his decision to deny the second appeal.  E.E. Decl. ¶ 17.

## II.     STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal quotations omitted).  To determine whether to grant a preliminary injunction, the Court considers four well-established prongs:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no

4877-7215-5146.1

injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir. 1996) (citations omitted). "Likelihood of success is the main bearing wall of the four-factor framework." *Id*. at 16 (citations omitted). Without establishing a strong likelihood of prevailing on the merits as opposed to a mere possibility of success, the other prongs are irrelevant. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (citation omitted). Plaintiff bears the burden that these factors weigh in his favor. *Nieves-Marquez v. P.R.*, 353 F.3d 108, 120 (1st Cir. 2003). The Court should not award the "extraordinary and drastic remedy" of a preliminary injunction unless Plaintiff meets his high burden of persuasion with "substantial proof." *Marzurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The Court should be especially cautious when a party seeks an injunction to alter an ongoing disciplinary process at a private university. "[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019) (quoting *Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E. 3d 373, 381 (2000)); *see also Guckenberger v. Bost. Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997) ("[C]ourts should be slow to intrude into the sensitive area of the student-college relationship, especially in areas of curriculum and discipline.") (internal citations omitted).

The Court does not have to determine what happened between Jane and Plaintiff, whether it would make the same judgment calls on the evidence as made by university administrators, or whether the disciplinary procedure was optimal. *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016). "This Court is not a super-appeals court for sexual misconduct cases, nor is it an advisor to Brown on how it should handle these messy and unfortunate situations." *Id*. "To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's

14

role to be an appeals court for Brown's disciplinary decisions.  Nor is it the case that any minor technical violation entitles a student to a new disciplinary hearing or a review by this Court." *Id.* at 331.  Further, "[i]t is not the Court's role to reevaluate [a university administrator's] discretionary calls so long as they are not against any of the explicit provisions of the contract or patently unreasonable." *Id.* at 338 (citing *Schaer*, 432 Mass. at 481, 735 N.E.2d at 373).

Plaintiff's Verified Complaint does not request the Court stop the University's ongoing disciplinary process, which Brown is authorized to conduct under its policies and procedures. Rather, Plaintiff wants the Court to overturn Brown's threat assessment determination, vacate the interim suspension, and order his reinstatement.  Essentially, Plaintiff seeks at the preliminary injunction stage that the Court enter the ultimate and entire equitable relief sought by his Verified Complaint.  *See SW Industries v. Aetna Cas. & Sur. Co.*, 646 F. Supp. 819, 823 (D.R.I. 1986) ("Preliminary injunctions of a mandatory nature are particularly disfavored when their effect would be to grant the ultimate relief sought by the moving party.").

## III.   ARGUMENT

### A.   Plaintiff has not shown a likelihood of success on the merits.

#### 1.   Plaintiff will not prevail in his breach of contract claim.

##### i.   The Court has recognized the judicial deference that must be shown to a university's administration of an educational contract with its students.

In *Doe v. Brown University*, the Court detailed the legal analysis applicable to a claim alleging a breach of an educational contract:

> To prevail in a breach of contract claim, "a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010) (citing *Petrarca v. Fid. & Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005)).  "To establish causation, the plaintiff must prove that the defendant's breach was the 'but for' cause of the alleged damages." *Id.* (citing

15

*Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1191 (R.I. 1994)).  "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." *Havlik* [*v. Johnson & Wales Univ.*], 509 F.3d [24, 34 (1st Cir. 2007)] (citation omitted). Rhode Island courts interpret the terms of a student handbook "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university should reasonably expect the student to take from them." *Id.* (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 84 (1st Cir. 1998).  Any "[a]mbiguities in a contract must be construed against the drafter of the document," *Haviland v. Simmons*, 45 A.3d 1246, 1259-60 (R.I. 2012), which in the case of a student handbook is the university.

However, "[b]ecause contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities." *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004); *see also Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E. 2d 373, 381 (2000) ("[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities . . . . 'A college must have broad discretion in determining appropriate sanctions for violations of its policies.'" (quoting *Coveney v. President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 445 N.E.2d 136, 139 (1983)).  Therefore, the rules set out in a university's handbook are "enforceable as long as [they are] not against public policy or law." *Gorman*, 853 A.2d at 39.  A rule "violates public policy only if it is: '[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression.'" *Id.* (quoting *City of Warwick v. Boeng Corp.*, 472 A.2d 1214, 1218 (R.I. 1984)).  Courts may also "provid[e] a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by the officers of those organizations." *King v. Grand Chapter of Rhode Island Order of E. Star*, 919 A.2d 991, 998 (R.I. 2007).

210 F. Supp. 3d at 330-31.

Applying this framework, the Court concluded in *Doe* that "[t]here are three broad questions the Court must answer," which Brown will apply to this case and analyze below:

1)   Whether Brown's rules and procedures, on their face, violate public policy or the law;

2)   Whether Brown violated any of the specific terms of its contract and/or applied its rules arbitrarily and capriciously;

3)   If there was a breach of contract, whether that breach caused the student's damage.

*Id.* at 331.

16

Regarding the first question, Plaintiff has not challenged the legality of Brown's policies, particularly the Sexual and Gender-Based Misconduct Policy and its related Complaint Procedure (the two controlling policies in Plaintiff's disciplinary case).  "Brown, as a private university, has ample discretion in designing its disciplinary process; the Court may only intervene if the process violates public policy or the law."  *Id*. at 332 (citing *Gorman*, 853 A.2d at 39).  That was not the case in *Doe*, nor is it the case here.  Skipping to the third question, Brown strongly denies that it has breached any contractual obligation to Plaintiff.  Regardless, even if Plaintiff could make such a showing, he has not established irreparable harm to compel an immediate preliminary injunction.

The second question is the focus here:  whether Plaintiff has shown that Brown violated any terms of his educational contract or applied the contract in an arbitrary or capricious manner. Brown has applied its policies in accordance with their stated procedures and exercised its decision-making authority within its institutional discretion.[7]

**ii.     Plaintiff has not shown any procedural violation in Brown's application of its policies**.

As detailed in Brown's accompanying declarations, Brown's Sexual and Gender-Based Misconduct Policy and its related Complaint Procedure authorize Brown to consider the

---

[7]     Plaintiff wrongly assumes that Brown is somehow being influenced or pressured by a putative class action filed by four named female plaintiffs (who are current and former Brown undergraduates) and their related social media campaign, alleging that Brown has applied its Title IX and sexual misconduct policies in a manner that dispels female undergraduates from reporting sexual misconduct and participating in the applicable processes and has disproportionately found in favor of male respondents in sexual misconduct cases decided under its policies. *See Soenen, et al. v. Brown Univ.*, C.A. No. 21-cv-325-JJM-PAS.  Brown wishes to be careful in avoiding any *ex parte* communications with the Court regarding that pending lawsuit.  Brown will simply respond that it views the *Soenen* lawsuit to lack merit. In fact, the University filed a lengthy motion to dismiss in that action, which prompted the plaintiffs to elect to re-plead their complaint (with the amended pleading due by January 28, 2022).  The University intends to renew its dispositive motion.  Plaintiff's assumptions about that lawsuit are uninformed and misguided.

17

appropriateness of an "Interim Action," including an "Emergency Removal."   Under the threat assessment process, the Threat Assessment Team first determines "whether there is reasonable cause to believe that the Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community." If the Threat Assessment Team determines that an emergency removal is warranted, it will recommend such an interim action to the Associate Vice President for Campus Life, who will determine whether to implement the student's emergency removal.  If the Associate Vice President imposes an emergency removal, the student may appeal the decision to the Vice President of Campus Life.

The University implemented and followed this process twice – first upon its receipt of Jane's formal complaint raising serious allegations of sexual misconduct that involved force and violence and imposed physical injuries and upon Plaintiff's submission of information in his defense.  The University's process has been conducted in accordance with a student's reasonable expectations, so there is no basis for a breach of contract claim asserting any procedural error.

Further, even where procedural error is found that substantially affected the outcome of a decision in the University's process (which Brown strongly denies), the sole judicial remedy is a remand back to the University to conduct the process again, with any alleged deficiencies corrected, as the Court concluded in *Doe*.  210 F. Supp. 3d at 313, 346-47.  *Doe* involved a breach of contract claim by a student alleging procedural errors in a disciplinary proceeding that found him responsible for sexual misconduct, and Judge Smith held, after a bench trial on the merits, "that [the determined] procedural errors likely affected the panel's decision . . . [a]ccordingly, Doe is entitled [to] a new hearing that remedies these infirmities."  *Id*. at 313.  The Court emphasized that it is not the Court's role to pass judgment on whether the outcome of the disciplinary process

that found Doe responsible was wrong – that was "for a Brown panel to decide if [Brown] chooses to [re-]present the matter after correcting the errors cited." *Id*. at 313 n.2; *id*. at 336 ("To be very clear, the Court is not in any way suggesting that it would be an error for a new panel to find Doe responsible. And if a new panel is convened and it finds him responsible, its finding will be binding (assuming no other contract violations occur) irrespective of this Court's conclusion.").

Again, Brown maintains that it properly conducted its threat assessment process and has made no procedural errors in the ongoing disciplinary proceedings to address Jane's sexual misconduct complaint against Plaintiff. Even, assuming *arguendo*, that a procedural error is found at this preliminary injunction stage, applying the Court's analysis in *Doe*, the matter must be remanded back to Brown, where the determination impacting the health and safety of Brown's campus and community (here, a threat assessment) should be made by the University. This approach, if warranted, is consistent with the cardinal principle under Rhode Island law that private schools are given "considerable latitude to formulate and enforce their own rules to accomplish their academic and educational objectives." *Gorman*, 853 A.2d at 39.[8]

### iii. Brown has not applied its educational contract with Plaintiff in an arbitrary and capricious manner.

The crux of Plaintiff's breach of contract claim seems to be his contention that there is not "reasonable cause to believe" that he will likely continue the alleged prohibited conduct in Jane's formal complaint and/or he poses a significant threat of harm to the health, safety, and welfare of others or the University community. Plaintiff seeks to transform this Court into a "super appeals" board to challenge to the merits of the Threat Assessment Team's recommendation to Associate

---

[8]   *See also Doe v. The Rector and Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 588 (E.D. Va. 2016) (finding the university should be permitted to pursue further disciplinary proceedings against a student, noting "the typical remedy for a violation of [procedural] due process in the university disciplinary process is more process.").

Vice President Bakkegard, the Associate Vice President's review of the recommendation and determination of appropriate interim actions, and the Vice President for Campus Life's consideration and determination of the appeals.  Plaintiff seeks to build another layer of appeal, by asking the Court to judge the merits of Brown's decision, which is not the Court's role.

As stated in *Doe,* Plaintiff must show that Brown acted in an "arbitrary and capricious" manner, in concluding that Plaintiff should be placed on an interim removal from campus through the end of the Fall 2021 semester and the submission of final semester grades on January 6, 2022 and should be placed on an interim suspension effective on January 7, 2022.  210 F. Supp. 3d at 331 ("Courts may also 'provid[e] a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by officers of those organizations.'") (quoting *King v. Grand Chapter of Rhode Island Order of E. Star*, 919 A.2d 991, 998 (R.I. 2007)).  As *Doe* emphasizes, "[i]t is not the Court's role to reevaluate [a university administrator's] discretionary calls so long as they are not against any of the explicit provisions of the contract or patently unreasonable."  *Id*. at 338 (citing *Schaer*, 432 Mass. at 481, 735 N.E.2d at 373).   In the context of an educational contract, courts have stressed the principle of judicial restraint and the heavy burden that a plaintiff bears to demonstrate arbitrary or capricious conduct.  *See*, *e.g.*, *Madej v. Yale Univ.*, Civ. Case No. 3:20-cv-133 (JCH), 2020 WL 1614230, at *12 (D. Conn. Mar. 31, 2020) ("[Plaintiff] 'bears a heavy burden in showing that his withdrawal resulted from arbitrary or capricious action.  To prevail, he must show that the [university's] decision had no 'discernable rational basis.'") (quoting *Gupta v. New Britain Gen. Hosp*., 239 Conn 574, 596, 687 A.2d 111 (1996)).

Plaintiff was afforded several opportunities to be heard by the University – through his submission on November 21, 2021 of his initial appeal, his conference on November 22, 2021

20

with Vice President Estes, his submission of his response to Jane's formal complaint on November 23, 2021, his submission of his second appeal on December 21, 2021, and his second conference with Vice President Estes on December 22, 2021.  During his two conferences with Vice President Estes, Plaintiff was afforded the opportunity to be heard, with his advisor present and the opportunity to take breaks in the conferences to consult with his advisor if he chose.  As stated in Vice President Estes' declaration, the University stands by its decision that an interim suspension is warranted, pending the completion of the process under the Sexual and Gender-Based Misconduct Policy and its Complaint Procedure.   Plaintiff's strong disagreement with the University's decision is insufficient to establish that Brown acted arbitrarily and capriciously, and he has not shown a likelihood of success on the merits.

> **2.     Plaintiff will not prevail on his breach of the implied covenant of good faith and fair dealing claim.**

A claim alleging a breach of the covenant of good faith and fair dealing is a claim sounding in contract, not tort, *Pride Hyundai, Inc. v. Chrysler Financial Co., LLC*, 263 F. Supp. 2d 374, 394 n. 39 (D.R.I. 2003), and the implied covenant may not be used to rewrite the contract; the implied covenant only requires the parties to perform the obligations actually expressed in the contract. *T.G. Plastics Trading Co., Inc. v. Toray Plastics (America), Inc.*, 958 F. Supp. 2d 315, 327 (D.R.I. 2013).  "Good faith and fair dealing cannot be separated from context," and in evaluating those covenants in the context of private educational contracts, the First Circuit has directed that "courts must accord a school some measure of deference in matters of discipline." *Havlik*, 509 F.3d at 35 (citing *Gorman*, 853 A.2d at 34).

"While every breach of the covenant of good faith and fair dealing implicates a breach of contract, not every breach of contract necessarily involves a breach of the covenant." *Hord Corp. v. Polymer Research Corp. of Am.*, 275 F. Supp. 2d 229, 237 (D.R.I. 2003).   A court's

determination that no breach of contract occurred therefore extinguishes a claim for breach of the implied covenant of good faith and fair dealing. *Pride Hyundai, Inc.*, 263 F. Supp. 2d at 394 n.39. Because, as discussed above, Brown did not breach any aspect of its educational contract with Plaintiff, no breach of the implied covenant occurred either.

Moreover, Plaintiff has not proven a cognizable claim for breach of the implied covenant for additional reasons.  "The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct." *Ross-Simons of Warwick v. Baccarat, Inc.*, 66 F. Supp. 2d 317, 329 (D.R.I. 1999), *aff'd.*, 217 F.3d 8 (1st Cir. 2017).  Nothing here comes close to this high standard of proof.  On the contrary, Brown undertook its threat assessment process twice to determine whether there is reasonable cause to conclude that an interim suspension is warranted because of a threat to others and the University community.  In accordance with its policies and institutional judgment, Brown's decisions undertaken in its protection and oversight of its community should not be altered by the Court.  Plaintiff has not shown a likelihood of success of the merits in his breach of the implied covenant of good faith and fair dealing claim.

> **B.      Plaintiff has not established irreparable harm that cannot be remedied later by a damages award, if he ultimately proves his case.**

Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon" Plaintiff, and a "finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Id.*; *see also Ross-Simons of Warwick, Inc.*, 102 F.3d at 19 ("[T]he plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or

overly speculative forecast of anticipated harm.").  In other words, Plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not just that it is "possib[le]." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

Critically, an injury is not irreparable simply because it could be remedied by an injunction. Rather, "'[i]rreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr, Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

### 1.    A delay in Plaintiff's anticipated completion of his undergraduate education and graduation date is not irreparable harm.

Citing to just three cases on page 22 of his memorandum, Plaintiff contends that "countless" courts have held that a delay in an undergraduate education and graduation constitute irreparable harm.  Actually, the majority of federal courts have concluded otherwise, denying injunctive relief because a delay in a student's ability to take core academics or graduate by a planned date does not constitute irreparable harm to justify judicial intervention to alter a school's action in its internal disciplinary process. *See*, *e.g.*, *Doe v. Texas A&M Univ.*, Civ. A. H-20-4332, 2021 WL 257059, at *7-9 (S.D. Tex. Jan. 26, 2021) (denying a motion for a preliminary injunction where Plaintiff alleged that he would suffer irreparable harm absent injunction because he would be unable to complete his coursework by his planned graduation date, he would lose his status as a [university] student, and he would suffer harm to his future educational and employment prospects).  In *Texas A&M*, the court acknowledged that the plaintiff, who (unlike Plaintiff here) was a senior at the university, would likely suffer an educational delay and resulting harm while the case was adjudicated on the merits, but such harm would be compensable in damages, if the plaintiff ultimately obtained a final judgment against the university.  2021 WL 257059, at *8.  In

joining the "many other courts finding that a delay in education is not irreparable harm," the court provided a detailed footnote collecting cases nationally where federal courts have reached the same conclusion. *Id.* at *8 n.1.

Among and in addition to the cases cited in the *Texas A&M*, the following rulings denying injunctive relief have found no irreparable harm caused by a delay in education or potential resulting reputational harm (if ultimately proven):

- *Hodges v. Bd. of Supervisors of La. St. Univ. and Agricultural and Mechanical Coll.*, Civ. A. No. 20-1456, 2020 WL 5017665, *4 (E.D. La. Aug. 25, 2020) (no irreparable harm shown by a student who claimed that he faced the prospect of being unable to re-enroll in the college for two to three years while awaiting possible judicial relief);

- *Doe v. Princeton Univ.*, 2020 WL 2097991, at *7 (D.N.J. 2020) (if plaintiff prevails on the merits of his underlying claims and is reinstated to Princeton, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation);

- *Madej v. Yale Univ.*, 2020 WL 1614230, at *6-7 (D. Conn. Mar. 31 2020) (academic withdrawal does not mean plaintiff will never be able to obtain his degree; rather, his ability to do so will be delayed which can be remedied through monetary compensation; reputational assertions are "too speculative to warrant injunctive relief");

- *Doe v. Vassar Coll.*, 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019) (finding no irreparable harm where plaintiff claimed he would "lose the ability to play college soccer as well as his ability to graduate with his class this year.");

- *Roden v. Floyd*, 2018 WL 6816162, at *5 (E.D. Mich. Nov. 13, 2018), *report and recommendation adopted*, 2018 WL 6815620 (E.D. Mich. Dec. 27, 2018) (if plaintiff ultimately prevails on the merits of his underlying claims and is reinstated, he will have suffered a delay in his education, but delays in education do not constitute irreparable harm);

- *Montague v. Yale Univ.*, 2017 WL 4942772, at *3-4 (D. Conn. Mar. 8, 2017) (harm from delay in completing education, not graduating with contemporaries, and possibility of decreased employment are quantifiable and can be adequately remedied by money damages);

- *Knoch v. Univ. of Pitts.*, 2016 WL 4570755, at *8-9 (W.D. Pa. Aug. 31, 2016) (any interruption of education or delay in entering the workforce can be adequately compensated by monetary damages should plaintiff succeed on the merits of his claims; it is speculative that plaintiff would lose any professional connections by virtue of his suspension);

- *Howe v. Penn. St. Univ. – Harrisburg*, 2016 WL 393717, at *6 (W.D. Pa. Feb. 2, 2016) ("even if the plaintiff would experience a delay [in education] as a result of his suspension, this would not constitute irreparable harm which would not be compensated with monetary damages in the future, if warranted"); *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("[C]ourts have also held that a suspension from school is not irreparable");

- *Caiola v. Saddlemir*e, 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013) (rejecting plaintiff's claim that the stigma of expulsion could interfere with his career as "speculative" and noting that "[i]n order to demonstrate that he will suffer irreparable injury, plaintiff must show that a monetary award will not adequately compensate him for his injuries");

- *Mahmood v. Nat'l Bd. of Med. Examiners*, 2012 WL 2368462, at *5 (E.D. Pa. June 21, 2012) (collecting cases holding that delays in education services do not constitute irreparable harm);

- *Phillips v. Marsh*, 687 F.2d 620, 622 (2d Cir. 1982) ("We can conceive of no irreparable harm that would accrue to [the plaintiff] in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages.").

As a particularly relevant example, in *Montague v. Yale Univ.*, the Connecticut Federal

District Court denied a preliminary injunction motion filed by an expelled student-athlete:

In this case, the court concludes that while Montague may suffer harm from his expulsion, he has not alleged irreparable harm warranting the imposition of a mandatory preliminary injunction. Montague argues that he will suffer irreparable harm from the delay in completing his education, not graduating with his contemporaries, and the possibility of decreased employment opportunities.

The court concludes that the harms Montague alleges are quantifiable and can be adequately remedied by money damages. If Montague prevails on the merits of his underlying claims and he is reinstated to Yale, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation. *See Pierre v. University of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("Moreover, courts have also held that a suspension is not

25

irreparable."); *Howe v. Pennsylvania State University – Harrisburg*, No. 1:16-0102, [2016 WL 393717, at *6] (M.D. Pa. Feb. 2, 2016) ("[T]he court finds that even if the plaintiff would experience a delay as a result of his suspension, this would not constitute irreparable harm which would not be compensated with monetary damages in the future, if warranted."). If Montague is in fact reinstated, he could potentially recover monetary damages for the wrongly imposed "suspension" time period.

2017 WL 4942772, at *3-4.

In the fewer (not "countless") cases where a court has entered preliminary injunctive relief reinstating a suspended student, the justifying circumstances were significantly more compelling than presented here generally. For example, in *Doe v. Middlebury Coll.*, No. 1:15-cv-192, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2016), the plaintiff, who was entering his final year at the college, showed irreparable harm because he had a confirmed employment position to begin immediately after his graduation, expressly contingent upon his successful completion of his degree at the college. Further, the alleged sexual misconduct occurred during a study abroad program hosted by another institution, which found under its policies that the plaintiff did not engage in the alleged misconduct. *Id*. at *1. But, after the host school's finding of non-responsibility, Middlebury undertook its separate subsequent *de novo* investigation and determination, which was not authorized by its policies pertaining to study abroad programs and agreements with Plaintiff as part of the study abroad program that participants would be subject to the policies and discipline of the host school. *Id*. at *3. The college sought to re-investigate a case in which the plaintiff had already been exonerated, notwithstanding that the college's policy did not allow for a second investigation. *Id*. This breach of policy compelled the court to find that the plaintiff had made a substantial showing of his likelihood of success on the merits and irreparable harm. *Id*.

26

As another example, in *Doe v. Penn. St. Univ.*, 276 F. Supp. 3d 300, 302 (E.D. Pa. 2017) (a case not cited in Plaintiff's memorandum), the student enrolled in an eight-year, joint undergraduate/medical school program between Penn State University and the Sidney Kimmel Medical College at Thomas Jefferson University.  Penn State sought to impose a suspension for "*as long as [the plaintiff] is a participant in the [dual degree] program*."  *Id*. at 314 (italics in original).  The court found irreparable harm because "[t]his suspension from the program would presumably last for another six years," not just his remaining two years at the undergraduate institution but also four subsequent years at the program's medical school if it adopted the suspension decision.  *Id*.  Also, the plaintiff's long suspension effectively barred him from ever enrolling in any medical school.  *Id*.

The students in the *Middlebury College* and *Penn State University* cases faced clearly specified irreparable and imminent educational and professional harms, compared to what Plaintiff has pled here generally.  Plaintiff pleads only that he will not be able to play his varsity sport during the Spring 2022 semester, that he may not graduate in May 2023 as planned, and that he may lose unspecified employment this summer.  His general assertions do not satisfy his heavy burden to present "substantial proof" to justify the "extraordinary and drastic" remedy of a preliminary injunction.  *Marzurek*, 520 U.S. at 972; *see also In re Rare Coin Galleries of Am., Inc*., 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction").

> ### 2.     Plaintiff's desire to play a varsity sport does not satisfy a showing of irreparable harm.

In seeking a preliminary injunction, Plaintiff makes clear that a primary motivation is his desire to play a varsity sport at Brown during the Spring 2022 semester.  The Court should not limit the University's institutional authority to decide whether Plaintiff may participate on a Brown

27

varsity team.  Plaintiff's personal desire to be a collegiate athlete is insufficient to demonstrate irreparable harm.

In *Doe v. Vassar College*, No. 19-cv-9601 (NSR), 2019 WL 6222918 (S.D.N.Y. Nov. 21, 2019), the court denied a preliminary injunction motion filed by a senior undergraduate student, who was suspended for one semester and sought his reinstatement in order to participate in a varsity sport and graduate at the end of the academic year.  The plaintiff claimed that, if the court did not lift his suspension, he would "forever lose his ability to play college soccer and will be forced, next Fall, to decide whether to return to school to obtain a degree and forfeit an opportunity to play soccer professionally, or elect to pursue his professional soccer ambitions and lose the ability to obtain a college degree for the foreseeable future and all the opportunities which accompany having obtained a degree."  *Id*. at *5.  The Court held that "the harm that Plaintiff will suffer from suspension of a single semester at the beginning of his senior year is not irreparable."  *Id*. at *6.  "[T]he harms a plaintiff might suffer from a delay in graduation are quantifiable and can be adequately remedied by money damages, should the plaintiff prevail on the merits of his case."  *Id*. (citation omitted).[9]

Once again overstating the scope and effect of the cases that he has cited, Plaintiff claims on page 23-24 of his memorandum that courts have "routinely found" that the loss an opportunity to play collegiate sports on a continuous and uninterrupted basis constitutes irreparable harm.  He relies upon two cases where both courts <u>denied</u> the requests for injunctive relief.  *Doe v. Univ. of*

---

[9]     In *Vassar College*, the plaintiff claimed that he will be labeled a sex offender and will have to explain his suspension to employers or graduate schools. The Court rejected this contention of alleged irreparable harm because the record of the plaintiff's suspension was protected from disclosure without his consent by the Family and Educational Rights and Privacy Act.  2019 WL 6222918, at *6 (citation omitted).

*Cincinnati*, Case No. 1:15-cv-600, 2015 WL 5729328 (S.D. Ohio Sept. 30, 2015); *Ganden v. National Collegiate Athletic Assoc.*, 1996 WL 680000 (N.D. Ill. Nov. 21, 1996)).

Further, both cases are inapposite and factually distinguishable. In the *University of Cincinnati* case, the plaintiff, a senior scheduled to graduate in December 2015, was suspended in September 2015 for one-year and was thereby unable to play for the university's varsity football team during the fall of 2015 (his final season of eligibility). 2015 WL 5729328, at *1. In the *NCAA* case, the plaintiff was a freshman at Michigan State University and was "rated as among the fastest young swimmers in the United States." 1996 WL 680000, at *1. The plaintiff suffered from a learning disability that impacted his grade point average in high school. *Id*. Consequently, upon enrolling in Michigan State University and seeking to swim competitively on its varsity team, the plaintiff lacked the required academic qualifier status to participate in NCAA competition. *Id.* at *2-5. The plaintiff's lawsuit against the NCAA (not the university) concerned his eligibility to compete in NCAA-sponsored collegiate athletics in light of his learning disability, not the right of a varsity athlete on an interim suspension for alleged sexual misconduct to continue to play his sport.

In sum, Plaintiff has not proffered any evidence of an unconditional right to continue to participate on a Brown varsity athletic team, especially when a properly conducted threat assessment has determined that he should be subject to an interim suspension. In a recent ruling (albeit in a different context than the facts of this case), the Court declined to enter a preliminary injunction sought by Brown varsity squash players, who challenged the University's decision to transition squash to club status and claimed that they had a four-year promise that they would be able to play varsity squash at Brown. *Sterman v. Brown Univ.*, 513 F. Supp. 3d 243, 253-57 (D.R.I. 2021). In finding no showing of irreparable harm, the Court held that the plaintiffs did not show

how their inability to participate in a varsity sport at Brown would result in specified future harms. *Id*. at 256-57.  Plaintiff has similarly failed to present any such evidence.

### 3.   Plaintiff seeks monetary damages, so he has an adequate remedy at law.

In his prayer for relief, Plaintiff seeks that the Court "award compensatory damages in an amount exceeding $75,000 to be determined at trial."  Where monetary damages are sought and available to be recovered if the plaintiff prevails on the merits, courts are generally unlikely to find irreparable harm.  *See*, *e.g.*, *Doe v. Amherst Coll.*, Civ. A. No. 14-cv-30114, 2014 WL 12597613, at *3 (D. Mass. July 28, 2014) ("The Court understands that the College's decision to withhold plaintiff's diploma may make it more difficult for plaintiff to find employment, but the harm of lost wages is routinely compensated with monetary awards and, therefore, is not irreparable.").

### C.   The balancing of the harms and public interest disfavor the entry of a preliminary injunction.

Any request for an injunction presents "a matter of equitable discretion," with "the balance of equities and consideration of public interest . . . pertinent in assessing the propriety of any injunctive relief, preliminary or permanent."  *Winter*, 555 U.S. at 32.  Brown has undertaken its threat assessment review consistent with its policies and procedures and exercising its proper authority.  Adhering to its limited role in a case of this nature, the Court should exercise restraint and refrain from intervening as a "super-appeals" court to review Plaintiff's disagreement with Brown's threat assessment determination.  *Doe*, 210 F. Supp. 3d at 313, 336.

The denial of pre-trial injunctive relief will not deprive Plaintiff of his later day in court, if he seeks to challenge Brown's disciplinary process against him including the final determination. To the extent that Plaintiff's academic and athletic pursuits may be delayed, he will be able to seek monetary damages, if he can prove at trial any breach of his educational contract.  In the meantime, Brown should be allowed to proceed with its process in accordance with its policies and

procedures, just as the University has done to date and will continue in its resolution of Plaintiff's case.

## IV.      CONCLUSION

For the foregoing reasons, Brown respectfully requests that the Court deny Plaintiff's emergency motion for injunctive relief in its entirety.


BROWN UNIVERSITY

By its Attorney,

/s/ Steven M. Richard
Steven M. Richard (#4403)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: 401-454-1020
Fax: 401-454-1030
srichard@nixonpeabody.com

Dated: January 20, 2022


CERTIFICATE OF SERVICE

I certify that, on the 20th day of January, 2022, I filed and served this memorandum via the Court's CM/ECF system.                               .


/s/ Steven M. Richard


31

4877-7215-5146.1