### UNITED STATES DISTRICT COURT
### DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DAVID SMITH, | ) | |
|        Plaintiff, | ) | |
| | ) | Case No.: 1:22-cv-00024-JJM-PAS |
|   vs. | ) | |
| | ) | |
| BROWN UNIVERSITY, | ) | |
|        Defendant. | ) | |
| _____ | ) | |

### REPLY IN SUPPORT OF
### PLAINTIFF DAVID SMITH'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF

In his opening memorandum, David Smith alleged that Brown violated its contractual obligations by (1) ignoring David's contractual right to a presumption of innocence and (2) failing to conduct a reasonable threat assessment. David pointed out that Brown may only impose suspension as an "interim measure" if it concludes "there is **reasonable cause to believe** that the Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community." Pl's Mem. 10–11. And in arguing that Brown had no reasonable cause to believe he was a threat, David alleged specific facts showing that the evidence he submitted to Brown established he was not. That evidence included photographs of the complaining student showing that she had no sign of the injuries she alleged (which she subsequently deleted), and his testimony that she had twice sought him out on the very day that she filed her complaint and again two days thereafter.

Brown declined to address *any* of these facts in its opposition. As a result, Brown's response fails to address the most fundamental question in this case—whether it had "reasonable cause to believe" David was a threat and that a suspension was the only way to mitigate that threat. Instead of explaining the factors it relied upon to reach its decision, Brown asserts, almost by fiat,

that it has a process that includes certain steps, and that it can make any decision it chooses at the conclusion of those steps, even if the steps have no substance. Moreover, Brown devotes most of its response to detailing procedural steps it fulfilled. There is no dispute that Brown held a lot of meetings and phone calls. But Brown's policy promises more than that. Brown affords accused students with a presumption of innocence (both in its Non-Title IX Policy and Student Rights and Responsibilities[1]), which Brown conveniently leaves out of its entire response. Brown could have implemented a policy stating that presumption would be automatically displaced, and that it could remove any student from campus, upon the mere allegation of violence by another student. It did not. Instead, Brown promised to presume innocence and to assess whether removing a student is reasonable under the facts and circumstances known to it. By declining to provide the *reasons* for its decision (as opposed to the process used to reach it), Brown all but concedes its decision was arbitrary and capricious—a decision without reason is arbitrary by definition. Brown's actions lack any discernable legal basis.

Moreover, the process Brown described is riddled with errors and mistakes; errors that David attempted to correct but that went ignored by Brown. Finally, Brown did not follow its process after the second appeal—it did not update the threat assessment rubric using its most current information; it instead relied solely on the complaint and its dated inaccurate information which, in and of itself, caused the process to fail. The result of this was necessarily a biased, arbitrary, and capricious decision in that Brown remained wedded to an old threat assessment that was never factually accurate.

---

[1] *See* https://www.brown.edu/offices/student-conduct/code/rights#:~:text=Students%20and%20student%20groups%20are,the%20appropriate%20student%20conduct%20proceeding (students afforded right "[t]o not be presumed responsible of any alleged violations unless so found through the appropriate student conduct proceeding").

This Court should reject Brown's argument that David will not be irreparably harmed by Brown's decision to suspend him before it has determined whether he is responsible for any misconduct. Brown claims it can cite more cases holding a gap in education is not irreparable harm, and it faults David for not listing every decision finding otherwise. Accordingly, below David has supplied additional cases finding irreparable harm under similar circumstances, including a later decision by the same District Court that Brown primarily relies on in the District of Connecticut. But the obviousness of the harm here should not depend on weighing the number of cases decided one way or another—the facts at issue in college disciplinary matters are invariably unique. It is entirely disingenuous for Brown to argue that the only harm a gap in education creates is a delayed entry to the workforce, measurable by lost salary. Many courts recognize that the gap will inevitably require a future explanation when applying to graduate school or employment. If David must truthfully disclose that the gap in his transcript was the result of an interim suspension following a sexual assault allegation, it is patently obvious that such a disclosure would cause untold and immeasurable harm in the form of lost opportunities and reputational damage.[2] David's irreparable harm comes in numerous forms including severe and permanent damage to his otherwise impeccable reputation, loss of summer employment, and loss of athletics. If suspended, this damage will be complete and universal to him.

## I.   FACTUAL BACKGROUND

Brown spends a full twelve pages, the near entirety of its factual background section, providing a walkthrough of definitions and processes from its policies—anodyne facts that are not

---

[2]   Brown spends inordinate portion of its brief arguing against relief David's motion explicitly did not request—arguing that it is correctly using its Non-Title IX Policy (Sexual and Gender-Based Misconduct Policy) to adjudicate David's disciplinary matter. While David disagrees with Brown's position, and it is clear Brown continues to deny that they clearly exercised control over both the parties involved and the "context" in which the allegations occurred, he does agree that this fight is for another day.

in dispute. The laborious approach highlights the fact that all Brown has done for David is subject him to a rote "check-the-box" exercise. It walked through the motions required in its processes and procedures, without a reasoned evaluation of the evidence presented, which Brown would have the Court believe is enough to satisfy its contractual obligations. But that is not the case.

When it comes to the Threat Assessment Team's actual evaluation of the evidence presented, Brown is noticeably brief. Opp. 9, 11. Brown provides no explanation of the Threat Assessment Team's evaluative decision, other than highlighting that the team reviewed only the allegations from Jane's complaint itself. Opp. 9. Brown does not explain what other information the team considered, what weight it gave that information, or how or why it concluded that David's proffered evidence did not alter its view of the complaint. Nor could Brown provide such explanation, because the Threat Assessment Team's notes—provided to David for the first time here, under seal—confirm that the *only* evidence the team considered was the complaint itself.

The notes from the Threat Assessment Team's initial meeting, on November 16, 2021, stated that a "No Contact Order" would be sufficient to protect "the reporting student." (ECF 15-1 at 4.). However, the notes then leap to the conclusion that an "interim suspension" was an additional "appropriate intervention for this incident *since an allegation of violent sexual assault is indicative of a significant threat of harm to the health, safety, and welfare of others or the University community*." *Id.* at 5 (emphasis added). These notes concede the fact that Brown's decision to suspend David was based on Jane's allegations alone, and that it was not to protect her (which the No Contact Order sufficiently did) but to protect others.

The Threat Assessment Team's notes, and the rubric the team completed, confirm the arbitrary and capricious nature of Brown's decision to suspend David *for the protection of the campus community*. Of the fourteen yes-or-no questions, only two were answered "Y": (1) "Did

the alleged acts or behaviors include force or violence, or was there a credible threat of force or violence?"; and (2) "If there is a harmed party, was that party alleged to be under the influence of excessive alcohol or other drugs?" (ECF 15-1 at 2–3.) Both "Y" conclusions were flawed, as seen on the face of the notes themselves. The acts that Jane alleged in her complaint were wholly unbelievable and incredible on their face—a notation should have been made as to their unbelievable nature or that they required additional corroboration. Plaintiff has attached pictures under seal that she posted from Halloween weekend that demonstrably refute the claims of physical injury accepted in the rubric. Also, Jane was not under the influence of "excessive alcohol," as she herself claimed that she was "drunk but aware of [her] surroundings." Pl's Mem. 4. Critically, the team did not even complete a required follow-up question regarding the complainant's intoxication: "If so, was it voluntary or involuntary?" (ECF 15-1 at 3.) The Threat Assessment Team had already predetermined David's fate, so it deemed completing that required question unnecessary.

The Threat Assessment Team also omitted critical information by simply marking that it was unknown ("U") whether Jane "receive[d] medical attention" for her alleged injuries. *Id.* Given that the entire basis of Brown's decision is an (unproven) assumption that violence occurred, it was incumbent upon Brown to follow up on such a critical issue, especially given the effect of its determination regarding violence (*i.e.*, suspending David because he was a "threat" to the community). The fact is, Jane did not seek or need medical attention—which wholly contradicts her allegations of severe physical harm.[3]

---

[3]    While it is not in the record before this Court, Plaintiff and his counsel can represent that subsequent evidence has come to light showing that Jane went out to one of the most popular and crowded late-night restaurants on Thayer Street with her friends immediately after leaving the party—hardly suggesting that she was someone who was seriously injured.

The Threat Assessment Team further erred in citing information that "reported [that Jane and David] see each other frequently." *Id.* at 4. The team had the means to check the veracity of that information—Jane's complaint itself, in which she claimed to have met David for the first time—but chose to overlook any information that would not support its decision. Brown also ignored a report from its own Brown University Police, which David provided to Brown, which clearly showed that David was not under the influence of excessive alcohol. Pl's Mem. 20. Despite a police report noting David as "cooperative and understanding," they somehow chose to mark "U" for unknown as to whether he was intoxicated. (ECF 15-1 at 3.)

Notably, the Threat Assessment Team's notes reveal that the *great weight* of the considerations required by its rubric favored David. Ten questions were marked "N," including the questions directly going whether he was a "threat" to the broader community: "Was any object, device, or weapon used during the act, or does the student possess or have access to objects, devise, or weapons that could be used for force or violence?"; "Have there been other force or violence reports about the same student?"; "Have there been other reports that the same student has endangered the safety of others?"; "Does the student have a history of violations or records from Brown or prior school indicating past use of force or violence or danger to the safety of others?"; "Has the student threatened further force, violence, and/or danger to the safety of the harmed party or others?"; and "Has the student caused significant disruption to the educational or residential environment or other campus community?" *Id.* at 2–4. These factors all weighed in David's favor; yet, the team assigned with evaluating whether he was a "threat" provided no explanation as to how his entire history of non-violence was overcome by one, unsupported allegation of sexual assault that had yet to be proven. In all of the meetings, in all of the calls which they devote almost

one third of their response to, they never address the actual issue, *i.e.*, that they could never identify anything in their rubric that suggests that David is a threat, other than Jane's bare allegation itself.

Brown suggests that David was treated more than fairly because he received a second evaluation by the Threat Assessment Team. But the number of times the Team met says nothing of whether its analysis was reasonable. And the notes from that subsequent assessment reveal that it convened for no purpose other than to rubber stamp the flawed conclusion it initially reached. (ECF 15-2.) The notes stated that the team had received David's response to the complaint and "additional information"; yet, the team provided absolutely no explanation for why that information did not affect or even factor into the outcome of its decision. The team seems not to have wrestled at all with the objective evidence contradicting Jane's claims. The entirety of Brown's analysis was as follows: "In balancing whether the new information mitigated the potential threat, the group generally felt that it did not change the accounting of the potential threat." *Id.* at 3. Rather than addressing any substance of David's five-page response and six-pages of attached evidence, including photographs, the team just responded that it "generally felt that it did not change" their decision.

It is also notable that the Threat Assessment Team prefaced these second notes by noting that it was reviewing "two cases" in which "[b]oth students" appealed their decisions. (ECF 15-2 at 2.) It is puzzling why the Threat Assessment Team would refer to "two cases" when it was tasked with undertaking an *individualized* assessment of David's case. Nothing in Brown's policies discusses anything other than an individualized assessment. In lumping the two cases together and ignoring the specific evidence from David's case, the Threat Assessment Team acted arbitrarily and capriciously and ignored their policy promising an individualized threat assessment. The notes from the second Threat Assessment Team meeting clearly state that the Threat Assessment Team's

initial recommendation was based on the contents of the Formal Complaint, "as appropriate for this process" (ECF 15-2 at 2)—but this is not what Brown's policy states (presumption of innocence). They go on to say that "Now they need to assess the level of threat in the context of this additional information," yet they do not update the rubric (they mysteriously claim they reevaluated it without any support) but say that they did not feel any of the answers had changed. This is simply impossible in the face of the factual evidence provided.

David also provided five-pages of evidence to Vice President Eric Estes in his second appeal dated December 20, 2021. In neither of the two appeals did Vice President Estes ask any questions regarding David's submissions or statements, nor did he, to the visible eye on the Zoom call, take a single note, nor record the Zoom call.

Moreover, it is false to suggest that Brown's rubric-based consideration included "concerns about other reported activities that have occurred at the off-campus locations at issue" (Opp. 9), as the only reported issue was a noise complaint from that same evening and some complaints about excessive trash—none of which relate to David being a threat. If there are historical issues at the house that they are referring to, none relate to David as this is his first year living in that house.

In trying to impress upon the Court the *procedures* that it followed, and diverting attention from the flawed analysis it engaged in, Brown omits—quite intentionally—any of the evidence it considered during those procedures. As is clear now, the only thing from which Brown justified its decision that David was a threat *to the community* was Jane's complaint—Brown admits that in both threat assessments. That is a clear violation of their policy. Yet, unlike other cases in this District in which Brown defends sexual misconduct suspensions,[4] Brown chose not to provide the

---

[4]    *See Stiles v. Brown University*, 1:21-cv-00497-MSM-LDA (D.R.I), ECF No. 24-1 ("Jane Roe's Formal Complaint") (filed by Brown under seal).

Court with a sealed copy of the complaint.[5] Their reasons are obvious. The complaint is a one-and-one-quarter-page, unsupported narrative that contains implausible descriptions and significant inconsistencies. *See* Pl's Mem. 5–7. The complaint is unbelievable on its face, and no reasonable decision-maker could render a decision based solely thereon. Plaintiff expected Brown to provide a copy of the complaint to the Court; however, to correct that omission, Plaintiff is filing a copy under seal with this submission.

Brown's omissions do not stop there. It also failed to mention—anywhere in its submissions—how its Threat Assessment Team evaluated the photographic evidence that it possessed after David responded to the complaint. *See* Pl's Mem. 7–8. These photographs should have been a critical component of the Threat Assessment Team's evaluation, as the team apparently credited (without any support) Jane's allegation that she "detailed bruises, bleeding earrings holes, hair pulled out." (ECF 15-1 at 3.) Of course, Brown ignores *how it evaluated* those allegations in light of the photographs, what weight it assigned the photographs, or what evidence it used to undermine the photographs. The photographs are clear proof demonstrating a lack of evidence supporting Brown's arbitrary and capricious decision.[6] Had Brown received an allegation of a fight between students resulting in a broken leg, and the respondent produced photographs of the complainant dancing the next day, it would not be reasonable—and entirely arbitrary and capricious—to maintain a suspension of the respondent based on the allegations alone. That is the situation presented here.

---

[5]   Plaintiff submits a copy of this complaint herewith, under seal, as well as sealed copies of his response to the compliant and his December 20, 2021 appeal to Vice President Estes.

[6]   Brown's complete lack of discussion regarding the photographs highlights their importance. In order to demonstrate to the Court the weight of this evidence that Brown possessed, Plaintiff submits herewith copies of eight of these photographs, filed under seal.

Finally, Brown completely disregards the fact that Jane affirmatively sought out David after the incident, on multiple occasions, and even came to his home to threaten him. Pl's Mem. 9. She came to his home the very day she filed her Title IX complaint. She also sought him out two days later. It is wholly unbelievable that she would seek him out the day that she filed her complaint and do so at his house at a last-minute gathering. That fact is obviously inconvenient in light of Brown's steadfast determination that David is a "threat" to the community. Jane certainly does not think so.

In sum, Brown refuses to follow its own procedures and evaluate *all the evidence*, in light of the presumption of innocence that David is afforded and the high "reasonable cause" standard necessary to suspend him. It is Brown's flawed and fundamentally unsound evaluation of the evidence—not the multiple layers of procedure it seeks to hide behind—that demonstrates that its suspension of David violates its own policies and was arbitrary and capricious. Its actions show that Brown has already predetermined the result and sealed David's fate with respect to the Threat Assessment Team. There is another active case against Brown in this District in which Brown took the same "suspend first, ask questions later" approach.[7] Clearly, Brown's patterns are motivated by the recent activity on campus and in court against Brown which we have previously cited has cropped up in the past six-to-nine months. Even though Brown had no evidence whatsoever to take any action against David, Brown ignored numerous less-punitive restorative options available to them (curfews, limited access to public spaces on campus, remote learning, etc.) and jumped immediately to a death penalty for David. Action by this Court is necessary to restore him as a student in good standing with the Brown community before he suffers irreparable harm when the semester begins next Wednesday, January 26, 2022.

---

[7]   *See Stiles v. Brown University*, 1:21-cv-00497-MSM-LDA (D.R.I).

## II.   ARGUMENT

### A.   David is Likely to Succeed on the Merits

David argued that Brown breached its contract with him by violating his contractual presumption of innocence, ignored its contractual obligation to craft a remedial and restorative "Interim Action" that protected the rights of both students, and abandoned its contractual duty to suspend him only if "reasonable cause" to believe he posed a threat existed. Pl's Mem. 16–17. Brown's opposition declines to respond to these points. It fails to mention the binding presumption of innocence at all. Literally nowhere in the document do they address this policy and procedure failure. Instead, Brown hopes to reduce the entire analysis to whether it superficially ensured that case-processing events occurred as generally scheduled, but little more than that. Again, it was Brown's choice to make this a contractual option for its students that they now choose to ignore because of the external pressures they are facing.

Brown urges that another district court decision, *Doe v. Brown University*, 210 F.Supp.3d 310 (D.R.I 2016), provides the solely applicable "framework" for the Court's decision here, Opp. 16. This Court is not bound by the methodology applied in another district court decision and, moreover, little persuasive value can be assigned to *Doe*, as the contractual obligations in that case and this differ markedly. *Doe*'s "primary argument" revolved around the definitions of consent in different versions of Brown's Title IX Polices. 210 F. Supp. 3d at 332. The court was not faced with the situation, presented here, of contractual obligations that require an analysis of whether Brown's threat assessment of David was supported by "reasonable cause." To determine whether that contractual obligation was breached is necessarily an evaluative inquiry.

For that reason, Brown's reliance on *Doe* for the proposition that district courts may not substitute their judgment for the university is misplaced. Instead, *Doe v. Johnson & Wales*

*University*, which Brown failed to cite, presents a much more analogous situation and guidance for the Court. 425 F. Supp. 3d 108 (D.R.I. 2019). That case presented a summary judgment decision on a student's claim that the university's disciplinary process failed to afford him "fairness" as promised by the university's policies. *Id.* at 113. Rather than deferring to the university's view that its process was "fair," the court determined that whether the university had met its contractual "fairness" obligation was a matter for the jury. *Id.* ("'Fair' is not a term with a commonly accepted definition. It is conclusory: its precise meaning fluctuates with the context in which it is used. Its meaning, particularly with respect to what components of an investigation and hearing process must be included in order to satisfy 'fair,' is thus open to interpretation. While the Court determines as a matter of law whether a contract term has a clear and unambiguous meaning, it is up to the fact-finder to determine that meaning once the Court finds that the term is susceptible of more than one interpretation.") (internal citation omitted). The same can be said here with respect to Brown's contractual obligation to provide a "reasonable" threat assessment, balanced against David's right to be presumed innocent.

At this early stage in the proceedings, the Court is the fact finder. In deciding whether David is entitled to a preliminary injunction, it is appropriate for the Court to evaluate and determine whether Brown satisfied its contractual obligations, including by imposing a suspension decision on him supported by "reasonable cause." Brown promised David a reasonable threat assessment. It claims that it met that requirement simply by going through the motions of holding meetings and reaching a decision. But it dodges the issue of whether that decision was reasonable, entirely failing to provide any basis from which to conclude its decision was reasonable. In fact, by failing to respond to David's facts, it has given this Court no reason to conclude that its decision was anything but arbitrary and capricious.

Sensing that it has no ground to stand upon, Brown argues that if the Court determines its decision was arbitrary, the most the Court can do is "remand" the matter "back to Brown." Opp. 19. Brown has given the Court no reason to believe that it would fulfill the obligations it owes David—the fact that Brown breached, on three occasions, its obligation to engage in a "reasonable" evaluation of the evidence demonstrates that any further attempt to get it right would be illusory and futile. Brown, having now fully demonstrated its intent to rely solely on an unsupported allegation of violence (as demonstrated in both threat assessments), should not be afforded any opportunity to "redo" and simply reverse engineer the decision it so unreasonably has clung to through three opportunities for threat assessments and two appeals.

Exactly like a Rule 50 motion at the end of a jury trial, this court has before it the *complete set of facts* that Brown had before it when it performed its threat assessment and rendered its decision. The Court can determine from those facts whether it would be "reasonable" to conclude that David was a threat to the Brown community. Plainly it is not, so this Court can issue a preliminary injunction accordingly. If any remand is to occur (which it should not), the Court should carefully tailor it to require Brown to do what it has failed to do so far. That is, Brown should be directed to explain, in a written record: why and how it finds Jane's complaint to be credible, despite its numerous and obvious inconsistencies and flaws; why and how it believes Jane's complaint alone to be sufficient evidence of David's "threat" to the community; why and how the allegations in the complaint overcome his presumption of innocence; why and how Jane's alleged injuries that do not appear in the photographs from up to 48 hours immediately following the incident (which photos Jane immediately removed from her social media sites, following David's response) presented are a legitimate basis to conclude that a violent act occurred; why and how David poses a threat to Jane when she twice sought him out after the fact one of which was

in his own residence where she alleges the conduct occurred; and why and how no other measures short of a suspension are enough to mitigate the threat. If the Court does not believe that Brown can answer those questions in a satisfactory manner that would justify a suspension, then it should not further penalize David for the time lost during this capricious process but rather should enforce the only outcome that a reasonable threat assessment should yield—no suspension pending the outcome of the formal complaint process.

**B.    David Smith Faces Irreparable Harm Without a Preliminary Injunction**

Brown takes issue with the number of cases that David initially cited on the issue of irreparable harm, and it posits that it has the upper hand because a "majority" of cases side with it. Opp. 23. Preliminary injunctions are not decided by which side musters more case citations. Citations do not dictate outcomes—facts do. The fact of the matter stands that *many* federal courts have found irreparable harm in cases of students forced to leave school due to sexual assault accusations:

- *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017) (irreparable harm factor weighed in favor of injunction where plaintiff "would be suspended for a year and suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing").

- *Doe v. Univ. of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020) (plaintiff faced irreparable harm because suspension would "forever change the trajectory of his education and career," where plaintiff, who had "a 3.5 GPA and an umblemished record," "would need to explain a gap on his résumé in future applications to schools or jobs" and "would also need to explain the suspension notation on his UCONN transcript, and a truthful explanation would seriously hinder his prospects") (internal quotation marks omitted).

- *Doe v. Rhodes Coll.*, No. 2:19-cv-02336 (W.D. Tenn. June 14, 2019), ECF No. 33 ("Plaintiff asserts that the disciplinary action taken against him has already damaged his reputation and may affect his ability to enroll at other institutions of higher education and to pursue a career. The Court agrees. These are irreparable harms that favor this Court granting the injunctive relief sought.")

-14-

- *Doe v. Rector & Visitors of Univ. of Virginia*, No. 3:19CV00038, 2019 WL 2718496, at *6 (W.D. Va. June 28, 2019) (plaintiff faced irreparable harm because he faced expulsion, "a penalty that could drastically curtail future educational and employment opportunities," and he had a job offer "contingent on receiving [his] degree and providing a copy of [his] transcript . . . documenting that [he has] graduated") (internal quotation marks omitted ).

- *Elmore v. Bellarmine Univ.*, No. 3:18CV-00053-JHM, 2018 WL 1542140, at *7 (W.D. Ky. Mar. 29, 2018) (plaintiff faced irreparable harm because he was placed on "probationary status" with school and "probation would damage [his] academic and professional reputations and may affect his ability to enroll at other institutions of higher education or medical school and to pursue a career," since he "would have to disclose his probationary status in both undergraduate transfer and medical school applications").

- *Doe v. Pennsylvania State Univ.*, 276 F. Supp. 3d 300, 313 (M.D. Pa. 2017) (plaintiff faced irreparable harm due to "his immediate suspension from the rapidly approaching Fall 2017 semester" and, even if plaintiff were able to successfully enroll in medical school following his suspension, the "gap" on his academic resume caused by the suspension "would constitute irreparable harm as he would forever be forced to explain his lengthy tenure within this program and, ultimately, his delayed entry into the professional workforce").

- *Nokes v. Miami Univ.*, No. 1:17-CV-482, 2017 WL 3674910, at *13 (S.D. Ohio Aug. 25, 2017) (while acknowledging "a split in authority," concluding that "suspension and harm to an individual's reputation [may] constitute irreparable harm as a matter of law," and that plaintiff faced irreparable harm because his suspension harmed his job opportunities and imposed "other complications that will prevent him from applying for competitive internships necessary to advance due to his lack of enrollment").

- *Ritter v. State of Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016) (plaintiff faced irreparable harm because "[t]he loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages").

- *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (plaintiff faced irreparable harm due, in part, to loss of job offer that was contingent upon graduation and for which plaintiff completed an internship and, further in part, because he "would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap").

- *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) (plaintiff faced irreparable harm because, if he "is not permitted to complete this upcoming semester at DePauw . . . he will forever have either a gap or a senior-year transfer on his record," and it would be "inevitable that

he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw," and money damages could never erase associated "stigma").[8]

To be sure, these are factually specific and politically divisive cases and, as a result, there are district court decisions coming down on both sides of the issue. The fact that some decisions come down without a finding of irreparable harm does not mean that should be the result here, especially when such cases are distinguishable. In, *Doe v. Texas A&M University*, the court was presented with "speculative" assertions of harm to education and employment prospects. No. CV H-20-4332, 2021 WL 257059, at *7 (S.D. Tex. Jan. 26, 2021). The court found that "educational delay" was not irreparable. *Id.* at *8. The court was not asked to decide—and did not purport to decide—whether particularized claims of employment loss and reputational harm, such as from explaining a gap on one's transcript, would suffice. The court in *Montague v. Yale University* gave particularly short shrift to the irreparable harm issue—and quite possibly for good reason, as the plaintiff had "waited over four months since the initial filing of his suit" to file for a preliminary injunction. No. 3:16-CV-00885(AVC), 2017 WL 4942772, at *4 (D. Conn. Mar. 8, 2017). The

---

[8] Numerous other examples, too long to fully list, exist. *See, e.g.*, *Doe v. Texas A&M University-Kingsville*, No. 2:21-cv-00257 (S.D. Tex. Nov. 5, 2021), ECF No. 18 ("Defendant suggested that monetary damages would be sufficient, but could not articulate how they could compensate for the lost semester, much less the complete loss of an opportunity for education and the reputational stigma of the sexual assault finding."); *Doe v. Rensselaer Polytechnic Inst.*, 2020 U.S. Dist. LEXIS 191676 (N.D.N.Y. October 16, 2020); *Doe v. Univ. of S. Miss.*, No. 2:18-cv-00153 (S.D. Miss. Sept. 26, 2018), ECF No. 35; *Doe v. Univ. of Mich.*, 325 F. Supp. 3d 821 (E.D. Mich. 2018), vacated (on other grounds) sub nom. *Doe v. Bd. of Regents of Univ. of Mich.*, 2019 WL 3501814 (6th Cir. Apr. 10, 2019); *Roe v. Adams-Gaston*, No. 2:17-cv-00945 (S.D. Ohio Apr. 17, 2018) (order granting preliminary injunction), ECF No. 46; *Richmond v. Youngstown State Univ.*, 2017 WL 6502833 (N.D. Ohio Sept. 14, 2017); *Culiver v. United State*s, No. 2:17-cv-03514 (S.D.N.Y. June 15, 2017) (order), ECF No. 14; *Doe v. Univ. of Notre Dame*, 2017 WL 1836939 (N.D. Ind. May 8, 2017), vacated at parties' request, 2017 WL 7661416 (N.D. Ind. Dec. 27, 2017); *Doe v. Weill Cornell Med. Coll. of Cornell Univ.*, 2016 WL 5369613 (S.D.N.Y June 8, 2016); *Doe v. Pa. State Univ.*, No. 4:15-cv-02072 (M.D. Pa. Oct. 28, 2015) ECF No. 12, vacated as moot, No. 4:15-cv-02072 (M.D. Pa. Apr. 4, 2016), ECF No. 49; *Doe v. George Washington Univ.*, No. 1:11-cv-00696-RLW (D.D.C. Apr. 8, 2011) (order granting temporary restraining order), ECF No. 8.

court's conclusory statements about an educational gap being measurable in money are unpersuasive, and many courts have disagreed.

It is not the time between graduation and employment that is the unquantifiable harm. Rather, it is the difficult explanation that the gap will require each time it is viewed by a prospective employer. In fact, the same district court that decided *Montague* decided, three years later, that such a gap *does* constitute irreparable harm: "For a college student poised to graduate in a few months, it is highly likely that a two-year suspension and a sanction for sexual assault would indeed forever change the trajectory of his education and career. If he is not permitted to enroll in the Spring 2020 semester, he would need to explain a gap on his résumé in future applications to schools or jobs. He would also need to explain the suspension notation on his UCONN transcript, and a truthful explanation would seriously hinder his prospects." *Doe v. Univ. of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020). Such harm cannot be measured or compensated for by money alone.

David clearly faces irreparable harm if not allowed to continue his academic and athletic pursuits at Brown. His supporting affidavit, submitted herewith under seal, demonstrates that he will lose a lose a specific summer job, for which he worked hard to obtain, which is essentially a summer-long interview for post-graduate work with a prestigious employer. Pl's Aff. ¶¶ 10–18. If he is unable to complete his Spring 2022 courses and cannot provide his employer with proof of his successful completion of the semester, it is nearly certain that he will lose that job. Pl's Aff. ¶ 18. Securing an equivalent replacement job for after graduation in that field will be nearly impossible. Pl's Aff. ¶¶ 15, 17, 19. Explaining his suspension and the resulting "gap" on his

academic transcript will forever handicap his ability to obtain employment with desired employers.[9] Pl's Aff. ¶ 19.

Moreover, David refers the Court to additional forms of irreparable harm that he will suffer, as articulated in his affidavit submitted herewith under seal. *See* Pl's Aff. ¶¶ 31–33. The harm will be become permanent, even if months later he is determined to be not responsible. This Court can stop that irreparable harm from occurring.

## III.   CONCLUSION

For the reasons set forth herein, David Smith respectfully requests that this Court restrain and enjoin Brown from denying him his contractual rights, from suspending him pending resolution of Jane Roe's complaint, denying him class attendance and participation, and denying him the ability to continue practicing, training, and competing in varsity athletics until such time as he is formally found responsible for the alleged conduct.

Dated:  January 21, 2022

Plaintiff, David Smith,
by and through his attorneys,

/s/ Maria F. Deaton
Maria F. Deaton, Esq. (#7286)
Lynch & Pine, Attorneys at Law
One Park Row, Fifth Floor
Providence, RI 02903
(401) 274-3306
mdeaton@lynchpine.com

and

/s/ Patrick C. Lynch
Patrick C. Lynch, Esq. (#4867)
Lynch & Pine, Attorneys at Law
One Park Row, Fifth Floor
Providence, RI 02903

---

[9]   The Court need only imagine how it would react upon seeking a law clerk candidates transcript showing a semester long-absence from school. Any truthful explanation of that absence would likely end that potential clerk's candidacy.

(401) 274-3306
plynch@lynchpine.com

and

/s/ Douglas F. Gansler
Douglas F. Gansler (admitted *pro hac vice*)
Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W.
Washington, DC 20001
(202) 862-2300
douglas.gansler@cwt.com

## CERTIFICATE OF SERVICE

I, Maria F. Deaton, certify that on January 21, 2022, this document was electronically filed

through the Court's CM/ECF system and is available for viewing and downloading to all registered

counsel of record.

/s/ Maria F. Deaton
Maria F. Deaton, Esq. (#7286)
Lynch & Pine, Attorneys at Law
One Park Row, Fifth Floor
Providence, RI 02903
(401) 274-3306
mdeaton@lynchpine.com